# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                          )
JOSEPH SCLAFANI, MICHAEL                  )
FEINSTEIN, and BRET CAPPOLA               )
                                          )        C.A. No. _____
              Plaintiffs,                 )
                                          )
       v.                                 )
                                          )
CAROL A. MICI, in her official            )
capacity as Commissioner of the           )
Massachusetts Department of               )
Correction, DOUGLAS DEMOURA,              )
in his official capacity as Superintendent )
of MCI-Cedar Junction, and STEVE          )
SILVA, in his official capacity as        )
Superintendent of MCI-Norfolk,            )
                                          )
              Defendants.                 )
_____)

## COMPLAINT
## AND REQUEST FOR EMERGENCY INJUNCTIVE RELIEF

Plaintiffs Joseph Sclafani, Michael Feinstein, and Bret Cappola complain against

Defendant Commissioner of the Massachusetts Department of Correction ("DOC") Carol A.

Mici, Defendant Superintendent of Massachusetts Correctional Institution-Cedar Junction

("MCI-Cedar Junction") Douglas DeMoura, and Defendant Superintendent of Massachusetts

Correctional Institution-Norfolk ("MCI-Norfolk") Steve Silva, as follows:

## INTRODUCTION

1.      This civil rights action on behalf of three Massachusetts prisoners challenges the

life-threatening and discriminatory denial of adequate medical care in DOC facilities. The

Defendants, who oversee those facilities, are legally obligated to meet the medical needs of

people in their custody. Yet when those medical needs concern opioid use disorder (or "OUD"),

1

a deadly disease that afflicts millions, Defendants fail to do so. This failure violates the Eighth

Amendment to the U.S. Constitution and the Americans with Disabilities Act ("ADA"), and

places the three Plaintiffs in grave and immediate danger.

2.      OUD is a chronic disease. The medical standard of care to treat this disease is

"medication for addiction treatment" (also known as "medication-assisted treatment," or

"MAT"), which utilizes three medications approved by the Food and Drug Administration

("FDA"): buprenorphine, methadone, and naltrexone. These medications drive MAT's efficacy,

and their duration and dosing must be based on individualized consideration of a person's

medical needs. Much like the treatment for any other chronic disease, the medically necessary

duration of MAT is generally lengthy and, in some cases, life-long. Once a patient is being

successfully treated for OUD through MAT, forcibly ending that treatment will cause the patient

to experience excruciating withdrawal symptoms that can have life-threatening complications, as

well as relapse.

3.      Jails and prisons throughout the country and within the Commonwealth have

begun to provide MAT to individuals in their custody. The Rhode Island and Vermont

Departments of Corrections now provide MAT to individuals throughout their incarceration. In

the last year, the federal Bureau of Prisons settled two federal lawsuits by agreeing to provide

MAT to individuals throughout their incarceration. And here in Massachusetts, since September,

seven Houses of Correction provide MAT to individuals throughout their incarceration.

4.      The DOC does not do this. No DOC correctional facility for men provides

methadone for opioid use disorder treatment to individuals in its custody. Only one correctional

facility for men—MCI-Cedar Junction—provides any buprenorphine to prisoners, but it does not

provide them with buprenorphine maintenance *treatment* for opioid use disorder. Instead, DOC

policy, as evidenced by both the words and actions of DOC staff and medical providers, is to automatically reduce individuals' buprenorphine dose to no more than 8mg per day, forcibly remove individuals from buprenorphine after just 90 days, and uniformly refuse to provide any further access to buprenorphine for the remaining months or years of their incarceration until the final 90 days of their sentences. The DOC follows this policy even where a person is taking a higher prescribed dose of buprenorphine when they enter custody, and their doctor's professional opinion is that involuntarily terminating treatment would violate the standard of care.

5.      Thus, for people in its custody who have opioid use disorder, DOC policy is to *withdraw* buprenorphine maintenance treatment rather than to *provide* it.

6.      Before entering MCI-Cedar Junction, each of the Plaintiffs had been diagnosed with OUD and was prescribed a daily buprenorphine maintenance dose based on their individual medical needs. This treatment was helping to keep each of them alive. The DOC has confirmed Plaintiffs' diagnoses and the existence of their prescriptions. Nevertheless, pursuant to an unyielding policy, medical staff at MCI-Cedar Junction told Plaintiffs that they could not receive buprenorphine in a dose larger than 8mg, or for longer than 90 days.

7.      Under this policy, MCI-Cedar Junction immediately halved Plaintiff Joseph Sclafani's 16mg per day dose when he entered the facility, and entirely discontinued his buprenorphine prescription on November 17, 2019. The doctor at MCI-Cedar Junction informed Mr. Sclafani that the prison provides buprenorphine only for the first and last 90 days of DOC custody. Mr. Sclafani has since been transferred to MCI-Norfolk, which does not provide any buprenorphine to prisoners for treatment of opioid use disorder.

8.      Similarly, when Plaintiff Michael Feinstein entered MCI-Cedar Junction, the facility reduced his 12mg per day dose to just 4mg per day. The doctor at MCI-Cedar Junction

told him that buprenorphine is provided for people struggling with opioid use disorder for at

most 90 days. As a result, Mr. Feinstein expects to be entirely removed from his buprenorphine

on January 6 or 7, 2020.

9.      Finally, after Plaintiff Bret Cappola entered MCI-Cedar Junction, a nurse

practitioner told him about the 90-day maximum duration of buprenorphine prescriptions for

those struggling with opioid use disorder. He has been informed that he will be entirely removed

from his 8mg per day dose of buprenorphine on December 30, 2019, before his transfer to MCI-

Norfolk.

10.     Pursuant to its policy, the DOC has already refused to provide Mr. Sclafani with

buprenorphine; it has already reduced the buprenorphine doses of Mr. Feinstein and Mr. Cappola

to medically insufficient levels; and it will soon completely terminate Mr. Feinstein's and Mr.

Cappola's buprenorphine prescriptions. When individuals have been prescribed buprenorphine to

help treat their opioid use disorder, forcing withdrawal causes excruciating symptoms and an

increased risk of relapse, overdose, and death.

11.     Accordingly, due to the DOC's compulsory-withdrawal policy, Plaintiffs have

been forced into an untenable situation: while in DOC custody, they can avoid excruciating

withdrawal symptoms and an increased risk of relapse, overdose, and death only if they purchase

their life-saving buprenorphine on the black market, thereby exposing themselves to potential

DOC discipline, retaliation, and an increased period of incarceration, as well as the hazards

associated with the purchase of a black-market drug.

12.     As applied to Plaintiffs, Defendants' actions are unlawful in three ways. First,

Defendants' policy of denying buprenorphine maintenance treatment for opioid use disorder

reflects deliberate indifference to Plaintiffs' serious medical needs, to their suffering, and to the

long-term consequences of forced withdrawal. Defendants' actions therefore violate Plaintiffs'

Eighth Amendment right to be free from cruel and unusual punishment. Second, Defendants'

denial of the necessary medical care through deviations from standards of care violates

Plaintiffs' right, under the Americans with Disabilities Act ("ADA"), to be free from

discrimination based on disability. Third, Defendants Mici and DeMoura also violate Plaintiffs'

ADA rights by segregating them and refusing to provide them access to the benefits of, services,

programs and activities available to other prisoners who are not prescribed buprenorphine.

13.    Plaintiffs seek emergency, preliminary, and permanent relief to require

Defendants to provide them with adequate medical care and prevent suffering. Specifically,

Plaintiffs seek declaratory and injunctive relief requiring Defendants to provide them with access

to their medically necessary MAT throughout their time in DOC custody. Plaintiffs also seek

declaratory and permanent injunctive relief requiring Defendants Mici and DeMoura to provide

Plaintiffs the benefits of the services, programs, and activities available to non-disabled

prisoners, and to house Plaintiffs in the most integrated setting appropriate to their needs.

## **THE PARTIES**

14.    Plaintiff Joseph Sclafani is a Massachusetts resident who is currently serving a

two-and-a-half- to four-and-a-half-year state sentence. He was admitted to MCI-Cedar Junction

on August 15, 2019. The DOC stopped providing him buprenorphine on November 17, 2019,

and he was transferred to MCI-Norfolk on November 20, 2019.

15.    Plaintiff Michael Feinstein is a Massachusetts resident who is currently serving a

three- to four-year state sentence. He was admitted to MCI-Cedar Junction on October 1, 2019.

The DOC will stop providing him buprenorphine on January 6 or 7, 2020.

16.     Plaintiff Bret Cappola is a Massachusetts resident who is currently serving a four-year state sentence. He was admitted to MCI-Cedar Junction on September 26, 2019. The DOC will stop providing him buprenorphine on December 30, 2019.

17.     Defendant Carol A. Mici is the Commissioner of the Massachusetts Department of Correction. She is being sued in her official capacity only, in which she is responsible for overseeing the operation of all DOC facilities.

18.     Defendant Douglas DeMoura is the Superintendent of MCI-Cedar Junction. He is being sued in his official capacity only, in which he responsible for the housing and care of prisoners at MCI-Cedar Junction.

19.     Defendant Steve Silva is the Superintendent of MCI-Norfolk. He is being sued in his official capacity only, in which he is responsible for the housing and care of prisoners at MCI-Norfolk.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The requested relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. This action seeks to vindicate rights guaranteed by the Eighth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983 and Title II of the ADA, 42 U.S.C. §§ 12131-12134.

21.     This Court has authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 706, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

22.     Venue lies in the District of Massachusetts under 28 U.S.C. § 1391.

## FACTS

A.    **Opioid Use Disorder Is a Life-Threatening Medical Condition and a Public Health Crisis.**

23.    Opioids are a class of drugs that inhibit pain and can have euphoric side effects. Many opioids have legitimate medical uses, including chronic pain management. Others, such as heroin, are not generally used in medicine in the United States, but are sold on the black market.

24.    OUD is a chronic brain disease with potentially deadly complications. Signs of opioid use disorder include cravings of opioids, increased tolerance to opioids, an inability to stop using opioids, withdrawal symptoms, and a loss of control.

25.    Like other chronic diseases, opioid use disorder often involves cycles of relapse and remission.

26.    Without treatment, patients with opioid use disorder are frequently unable to control their use of opioids. Opioid use disorder is progressive and can result in disability or premature death, including due to accidental overdose.

27.    Opioid use disorder is a national public health crisis. As of 2016, 2.1 million Americans suffered from this disease.[1] Between 1999 and 2017, more than 400,000 people died from opioid overdose.[2] The number of opioid overdose deaths in 2017 was six times higher than in 1999.[3] The national death toll of opioid overdose increased exponentially from 2013 to 2017,

---

[1] SAMHSA, *Medications for Opioid Use Disorder for Healthcare and Addiction Professionals, Patients, and Families, Treatment Improvement Protocol Tip 63*, at ES-2.
[2] Centers for Disease Control and Prevention, *Opioid Overdose, Understanding the Epidemic*, *available at* https://www.cdc.gov/drugoverdose/epidemic/index.html (last updated Dec. 19, 2018).
[3] *Id.*

and remained constant at the 2017 rate from 2018 to January 2019.[4] Every day in America, an

average of 130 people die after overdosing on opioids—equivalent to one person every 12.5

minutes.[5]

28.    In Massachusetts, the Department of Public Health reported 2,033 confirmed and

estimated opioid-related overdose deaths in 2018, or an average of more than five opioid-related

overdose deaths per day.[6] The opioid-related death rate in Massachusetts has far exceeded the

national average, with an especially sharp rise from 2013 to 2016.[7]

29.    Opioid use disorder is especially dangerous for people who are or have been

incarcerated.

30.    As the 2017 Final Report from the President's Commission on Combating Drug

Addiction and the Opioid Crisis explained, "[i]n the weeks following release from jail or prison,

individuals with or in recovery from OUD are at elevated risk of overdose and associated

fatality."[8]

31.    A study by the Massachusetts Department of Public Health similarly found that

"[t]he opioid overdose death rate is 120 times higher for those recently released from

---

[4] Centers for Disease Control and Prevention, *National Center for Health Statistics, Provisional Drug Overdose Death Counts, Figure 2: 12 Month-ending Provisional Number of Drug Overdose Deaths by Drug or Drug Class*, *available at* https://www.cdc.gov/nchs/nvss/vsrr/ drug-overdose-data.htm (last updated Dec. 11, 2019).
[5] *Id.*
[6] Massachusetts Department of Public Health, *Data Brief: Opioid-Related Overdose Deaths Among Massachusetts Residents* (Nov. 2019), *available at* https://www.mass.gov/doc/opioid-related-overdose-deaths-among-ma-residents-november-2019/download.
[7] Massachusetts Department of Public Health, *The Massachusetts Opioid Epidemic, A data visualization of findings from the Chapter 55 Report*, http://www.mass.gov/chapter55/.
[8] *The President's Commission on Combating Drug Addiction and the Opioid Crisis* (Nov. 2017), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/images/ Final_Report_Draft_11-15-2017.pdf (hereinafter "President's Commission").

incarceration compared to the rest of the adult population."[9] The same study found that "[o]pioid-related deaths among persons recently released from incarceration [in Massachusetts] have increased 12-fold between 2011 and 2015," and, "[i]n 2015, nearly 50% of all deaths among those released from incarceration were opioid-related."[10]

### B.  MAT Is the Standard of Care for Opioid Use Disorder.

32.  MAT "is a comprehensive approach that combines FDA-approved medications . . . with counseling and other behavioral therapies to treat patients with opioid use disorder (OUD)."[11] The primary driver of treatment efficacy in MAT regimens is the medication.

33.  Three medications used in MAT are buprenorphine (sold under brand names such as Subutex, Suboxone, and Bunavail), methadone (sold under brand names such as Dolophine and Methadose), and naltrexone (sold under brand names such as ReVia and Vivitrol). The FDA has approved these medications for treating opioid addiction.

34.  Naltrexone works by blocking opioids from producing their euphoric effects and thus reducing a desire for opioids over time. Buprenorphine and methadone act through a

---

[9] Massachusetts Department of Public Health, *An Assessment of Fatal and Nonfatal Opioid Overdoses in Massachusetts 2011-2015* (August 2017), *available at* https://www.mass.gov/files/ documents/2017/08/31/legislative-report-chapter-55-aug-2017.pdf. Chapter 55 of the Acts of 2015, as amended by Chapter 133 of the Acts of 2016, instructed the Secretary of Health and Human Services and the Department of Public Health to "conduct or provide for an examination of the prescribing and treatment history, including court-ordered treatment or treatment within the criminal justice system, of persons in the commonwealth who suffered fatal or nonfatal opiate overdoses." *Id.* The preliminary "Chapter 55" report for years 2013-2014 was published on September 15, 2016. On August 16, 2017, the Executive Office of Health and Human Services released an updated report for years 2011 through 2015.
[10] *Id.*
[11] FDA, *FDA News Release, FDA approves first generic version of Suboxone sublingual film, which may increase access to treatment for opioid dependence* (June 14, 2018), *available at* https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm610807.htm.

different mechanism: both activate, rather than block, opioid receptors to relieve withdrawal symptoms and control cravings.

35.     Because they act on opioid receptors without presenting the same risk of overdose that heroin and fentanyl do, buprenorphine and methadone have been deemed "essential medicines" by the World Health Organization.[12] Both buprenorphine and methadone facilitate extinction learning (a gradual decrease in response to a stimulus, such as an opioid) because patients learn that they will not get the same "high" from taking illicit drugs.

36.     As with many prescription medications, patients' responses to these medications are individualized. A patient may find that only one of these medications and only certain doses provide effective treatment without significant adverse side effects.

37.     In addition, much like the treatment for other chronic diseases, MAT maintenance is generally lengthy, and sometime lifelong. As the FDA recognizes, there is no maximum recommended duration for maintenance treatment on buprenorphine, methadone, or Vivitrol; it may continue indefinitely.[13]

38.     Methadone and buprenorphine can also be used for medically managed withdrawal—also known as "medically supervised withdrawal" or "detoxification"—which is *not* MAT and does *not* constitute treatment of opioid use disorder.[14] Medically managed withdrawal attempts only to ease the physical symptoms of withdrawal for a limited time.

---

[12] *See* National Institute on Drug Abuse, *Effective Treatments for Opioid Addiction*, *available at* https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction/effective-treatments-opioid-addiction (last updated Nov. 2016).
[13] *See* FDA, *Information about Medication-Assisted Treatment (MAT)*, *available at* https://www.fda.gov/drugs/information-drug-class/information-about-medication-assisted-treatment-mat (last updated Feb. 14, 2019).
[14] *See* SAMHSA, *supra* note 1 at 1-9.

39.     As the Substance Abuse and Mental Health Services Administration

("SAMHSA") explains, maintenance MAT "[p]rovid[es] medications to achieve and sustain

clinical remission of signs and symptoms of OUD and support the individual process of recovery

without a specific endpoint (as with the typical standard of care in medical and psychiatric

treatment of other chronic illnesses)," whereas medically managed withdrawal "[u]s[es] an

opioid agonist . . . in tapering doses or other medications to help a patient discontinue illicit or

prescription opioids."[15]

40.     Medically managed withdrawal does not improve long-term outcomes for

individuals struggling with opioid use disorder. In fact, "[p]atients who complete medically

supervised withdrawal are at risk of opioid overdose."[16]

41.     In contrast, studies of MAT show that it improves retention in treatment,

abstinence from illicit drugs, and decreased mortality. MAT has been shown to decrease opioid

use, opioid-related overdose deaths, criminal activity, and infectious disease transmission.[17]

MAT has also been shown to increase patients' social functioning and retention in treatment.

42.     Studies have shown that maintenance medication treatments of opioid use

disorder reduce all-cause and overdose mortality and have a more robust effect on treatment

---

[15] *Id.* at 2.2.

[16] *Id.* at 1-9.

[17] Nora D. Volkow et al., *Medication-Assisted Therapies — Tackling the Opioid Overdose Epidemic*, 370 NEW ENG. J. MED. 2063, 2064 (May 29, 2014), *available at* https://www.nejm.org/doi/pdf/10.1056/NEJMp1402780; National Institute on Drug Abuse, *Effective Treatments for Opioid Addiction*, *available at* https://www.drugabuse.gov/publications/effective-treatments-opioid-addiction/effective-treatments-opioid-addiction (last updated Nov. 2016).

efficacy than behavioral components of MAT.[18] Buprenorphine and methadone have been

clinically proven to reduce opioid use more than (1) no treatment, (2) outpatient treatment

without medication, (3) outpatient treatment with placebo medication, and (4) detoxification

only.

43.     One study documented the treatment outcomes from a detoxification facility and

showed (1) a twenty-nine percent relapse on the day of discharge, (2) a sixty percent relapse after

one month, and (3) a success rate of between only five to ten percent after one year.[19]

44.     Once a patient is successfully recovering from opioid use disorder through MAT,

arbitrarily and involuntarily ceasing the medication or decreasing the dosage violates the

standard of care and, in the case of buprenorphine and methadone, will cause excruciating

withdrawal symptoms unless the patient is tapered over the course of many months or years.

Withdrawal symptoms include severe dysphoria, cravings for opiates, irritability, sweating,

nausea, tremor, vomiting, insomnia, and muscle pain. These symptoms can sometimes lead to

life-threatening complications.

45.     Withdrawal is particularly dangerous for patients with pre-existing psychiatric

conditions, such as anxiety or depression, because withdrawal symptoms can exacerbate their

psychiatric illness.[20]

---

[18] *See* Laura Amato et al., *Psychosocial combined with agonist maintenance treatments versus agonist maintenance treatments alone for treatment of opioid dependence*, COCHRANE DATABASE SYST. REV. 1, 2 (Oct. 5, 2011).
[19] Genie L. Bailey et al., *Perceived relapse risk and desire for medication assisted treatment among persons seeking inpatient opiate detoxification.*, 45(3) J. SUBST. ABUSE TREAT. 302, 304-05 (June 18, 2013); George E. Valiant, *What does long-term follow-up teach us about relapse and prevention of relapse in addiction?*, 83 BR. J. ADDICTION 1147, 1152-57 (1988).
[20] Federal Bureau of Prisons, *Clinical Guidance on the Detoxification of Chemically Dependent Inmates* at 3 (Feb. 2014, reformatted Jan. 2018), *available at* https://www.bop.gov/resources/pdfs/detoxification.pdf (hereinafter "BOP Clinical Guidance on Detoxification").

**C.**    **Both the Federal Government and the Commonwealth of Massachusetts Have Widely Adopted the Medical and Scientific Consensus that Medication for Addiction Treatment Is the Standard of Care for Opioid Use Disorder.**

46.    Embracing the medical and scientific consensus, numerous federal entities have expressly endorsed the necessity of MAT, including: the Department of Health and Human Services (HHS),[21] the FDA,[22] the National Institute on Drug Abuse (NIDA),[23] the President's Commission on Combating Drug Addiction and the Opioid Crisis,[24] the Office of National Drug Control Policy,[25] and SAMHSA.[26]

---

[21] *See, e.g.*, FDA, *FDA News Release, FDA takes new steps to encourage the development of novel medicines for the treatment of opioid use disorder* (Aug. 6, 2018), *available at* https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm615892.htm (Health and Human Services Secretary Alex Azar explaining that " '[t]he evidence is clear: medication-assisted treatment works, and it is a key piece of defeating the drug crisis facing our country.' ").

[22] *See, e.g., id.* (former FDA Commissioner Dr. Scott Gottlieb underscoring, " '[we're committed to doing our part to expand access to high-quality, effective medication-assisted treatments and encouraging health care professionals to ensure patients with opioid use disorder are offered an adequate chance to benefit from these therapies. This work also includes improving understanding about the treatment options available for patients and countering the unfortunate stigma that's sometimes associated with their use.' ").

[23] *See, e.g.*, NIDA, *What Science tells us About Opioid Abuse and Addiction*, Nora D. Volkow Testimony to Congress (Jan. 27, 2016) (testifying before the Senate Judiciary Committee in late January 2016, NIDA Director Dr. Nora Volkow explained that "[m]edications have become an essential component of an ongoing treatment plan, enabling opioid-addicted persons to regain control of their health and their lives," while emphasizing, "[t]o be clear, the evidence supports long-term maintenance with these medicines in the context of behavioral treatment and recovery support, not short-term detoxification programs aimed at abstinence.").

[24] *See, e.g.*., President's Commission, *supra* note 8 at 68 (noting that treatment for opioid use disorder "should include" five elements including "[a]ccess to MAT (e.g., methadone, buprenorphine/naloxone, naltrexone). Choice of medication should be made by a qualified professional in consultation with patient, and based on clinical assessment.").

[25] *See, e.g.*, Office of National Drug Control Policy, *National Drug Control Strategy* (Jan. 2019) at 10, *available at* https://www.whitehouse.gov/wp-content/uploads/2019/01/NDCS-Final.pdf ("The Administration will work across the Federal government to remove barriers to substance use disorder treatments, including those that limit access to any forms of FDA-approved MAT, counseling, certain inpatient/residential treatment, and other treatment modalities.") (hereinafter "National Drug Control Strategy").

[26] *See, e.g.*, SAMHSA, *supra* note 1 at 1-3 ("Ongoing [] medication treatment for OUD is linked to better retention and outcomes than treatment without medication[,]" and certain MAT medications, including buprenorphine, "were [] found to be more effective in reducing illicit

47.     HHS has confirmed that MAT is the standard of care for opioid use disorder. An April 2019 HHS Fact Sheet declares that "we know that medication-assisted treatment is the standard of care for opioid use disorder."[27]

48.     SAMHSA has emphasized that MAT is more effective in reducing illicit opioid use than no medication, a metric which SAMHSA describes as "the gold standard for demonstrating efficiency in clinical medicine."[28] SAMHSA has concluded that "just as it is inadvisable to deny people with diabetes the medication they need to help manage their illness, it is also not sound medical practice to deny people with OUD access to FDA-approved medications for their illness."[29] SAMHSA has also highlighted that "dosing and schedules of pharmacotherapy must be individualized,"[30] and that some individuals may require "lifelong treatment."[31]

49.     The Department of Justice has also confirmed that MAT is the standard of care for the treatment of opioid use disorder. In 2017, its Civil Rights Division launched the Opioid Initiative to enforce the ADA and work with U.S. Attorney's Offices nationwide "[t]o ensure that people who have completed, or are participating in, treatment for OUD do not face unnecessary and discriminatory barriers to recovery."[32]

--------

opioid use than no medication" and "have also been associated with reduced risk of overdose death.").

[27] HHS, *Fact Sheet: Combating the Opioid Crisis* (Apr. 24, 2019), *available at* https://www.hhs.gov/sites/default/files/opioids-fact-sheet-april-2019.pdf.

[28] SAMHSA, *supra* note 1 at ES-2.

[29] *Id.*

[30] *Id.* at ES-5.

[31] *Id.* at ES-2.

[32] Charlotte Lanvers & Erin Meehan Richmond, Department of Justice, Opioid Use Disorders and the Americans with Disabilities Act: Eliminating Discriminatory Barriers to Treatment and Recovery Panel at the National Prescription Drug Abuse & Heroin Summit (Apr. 4, 2018), *available at* https://ncrip.org/files/D2DF00000/037.pdf.

50.     Massachusetts officials have similarly emphasized the efficacy of MAT. As noted

by Massachusetts Department of Public Health Commissioner Dr. Monica Bharel,

"'[m]edication for opioid use disorder works.'"[33]

**D.     Providing Medication for Addiction Treatment Is Particularly Important, and Administrable, in Correctional Settings.**

51.     Withholding prescribed MAT from incarcerated people with opioid use disorder

causes some of them to die.

52.     As the President's Commission on Combating Drug Addiction and the Opioid

Crisis has explained, "MAT has been found to be correlated with reduced risk of mortality in the

weeks following release" from incarceration, and a "large study of individuals with OUD

released from prison found that individuals receiving MAT were 75% less likely to die of any

cause and 85% less likely to die of drug poisoning in the first month after release."[34]

53.     Withholding MAT in jails and prisons also forces incarcerated individuals into an

untenable choice between experiencing acute withdrawal from their buprenorphine maintenance

treatment and purchasing buprenorphine on the black market to continue their life-saving

treatment. The first is extraordinarily painful, and the second risks DOC discipline, retaliation,

and an increased period of incarceration.

54.     Given the serious risks that opioid use disorder poses for incarcerated people,

numerous authorities require or recommend that jails and prisons provide maintenance MAT to

those in their custody.

---

[33] Robert Hayes, *Middlesex Sheriff Peter Koutoujian, Colleagues Launch Landmark Medication Assisted Treatment Pilot Program*, Wilmington Apple (Sept. 9, 2019), https://wilmingtonapple.com/2019/09/09/middlesex-sheriff-peter-koutoujian-colleagues-launch-landmark-medication-assisted-treatment-pilot-program/.
[34] President's Commission, *supra* note 8 at 72.

55.     For example, the Department of Justice's Adult Drug Court Discretionary Grant

Program requires grantees to permit the use of MAT.[35]

56.     On behalf of the Trump Administration, the ONDCP's 2019 report establishes

"increasing the availability of MAT for incarcerated individuals" as a priority initiative.[36]

57.     SAMHSA identifies making treatment available to criminal justice populations as

one of the remaining challenges in fighting the opioid public health crisis.[37]

58.     In a 2018 report, the National Sheriffs' Association and the National Commission

on Correctional Health Care explain that "correctional withdrawal alone actually increases the

chances the person will overdose following community release due to loss of opioid tolerance"

and "[f]or this reason, all individuals with OUD should be considered for MAT" while they are

incarcerated.[38] This report emphasizes that providing MAT in jails and prisons can

"[c]ontribut[e] to the maintenance of a safe and secure facility for inmates and staff" and reduce

recidivism, withdrawal symptoms, the risk of post-release overdose and death, and disciplinary

problems.[39] It further highlights the dangers of involuntary withdrawal from MAT in carceral

settings, noting that, "forced detoxification of prescribed opioid medication, such as methadone,

---

[35] U.S. Dept. of Justice, Adult Drug Court Discretionary Grant Program FY 2018 Competitive Grant Announcement (June 5, 2018), *available at* https://www.bja.gov/funding/Drug Courts18.pdf.
[36] National Drug Control Strategy, *supra* note 25 at 9.
[37] SAMHSA, *Medication-Assisted Treatment For Opioid Addiction in Opioid Treatment Programs, A Treatment Improvement Protocol, TIP 43*, at 6-8 (2017).
[38] National Sheriffs' Association, *Jail-Based Medication-Assisted Treatment, Promising Practices, Guidelines, and Resources for the Field*, at 9 (Oct. 2018), *available at* https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf (hereinafter "National Sheriffs' Association"); *see also id.* at 21 ("Jails should establish systems to ensure that detainees and sentenced inmates who had been receiving MAT, particularly methadone and buprenorphine, prior to their arrest have MAT continued when feasible.").
[39] *Id.* at 5-6.

can undermine an individual's willingness to engage in MAT in the future, compromising the

likelihood of long-term recovery."[40]

59.     The American Society of Addiction Medicine, the leading professional society in

the country on addiction medicine, also recommends treatment with MAT for people with opioid

use disorder in the criminal justice system.[41]

60.     The National Academies of Science, Engineering, and Medicine cautions that

inmates' lack of access to MAT leads to a greater relapse and overdose rate.[42]

61.     As these authorities recognize, providing MAT in a correctional setting saves

lives and is administrable.

62.     Many jails and prisons now provide access to MAT to incarcerated individuals. In

August 2018, the Massachusetts legislature enacted the CARE Act, which required five counties

to provide all three forms of MAT to individuals in their custody by September 1, 2019 as part of

a pilot program. As of that date, seven Houses of Correction in Massachusetts now provide

maintenance buprenorphine and methadone treatment to individuals in their custody during their

---

[40] *Id.* at 21.
[41] Kyle Kampman & Margaret Jarvis,, *American Society of Addiction Medicine (ASAM) National Practice Guideline for the Use of Medications in the Treatment of Addiction Involving Opioid Use,* 9 J. ADDICTION MED. 1, 4-6 (2015) *available at* https://www.asam.org/ docs/default-source/practice-support/guidelines-and-consensus-docs/asam-national-practice-guideline-jam-article.pdf.
[42] National Academies of Sciences, Engineering, and Medicine, *Medications for Opioid Use Disorder Save Lives*, at 99 (2019), *available at* https://www.nap.edu/read/25310/chapter/6#98 ("People with a history of OUD have a demonstrably high risk of mortality following release from incarceration. One study found an all-cause mortality rate of 737 per 100,000 person-years among former prisoners, with opioids related to almost 15 percent of all deaths.") (internal citations omitted).

entire periods of incarceration.[43] Within the first week, nearly 100 individuals had already received maintenance MAT throughout the seven Houses of Correction.[44]

63.     Other facilities throughout the country also follow the medical standard of practice and allow prisoners to continue with MAT during incarceration. Examples include Bernalillo County Metropolitan Detention Center (New Mexico); Rikers Island Correctional Facility (New York); Kings County Jail (Washington State); Orange County Jail (Florida). The Rhode Island and Vermont Departments of Correction make MAT available to all of their prisoners suffering from opioid use disorder throughout their entire sentence, even those who were not receiving MAT before being incarcerated.

64.     Following the medical standard of care yields positive results in the carceral setting. After the first year of the program within the Rhode Island Department of Corrections, 95% of inmates who were on MAT during the periods of their incarceration continued with their treatment after their release.[45] "Research showed that this program reduced post-release deaths by 60 percent and all opioid-related deaths in the state by more than 12 percent."[46] "Many participants stated that an ancillary benefit to the program was a lower prevalence of illicit drugs in the facility due to decreased need to use among people who are incarcerated."[47]

---

[43] Middlesex Sheriff's Office, *Press Release, Sheriffs announce launch of landmark medication assisted treatment (MAT) pilot program* (Sept. 6, 2019), *available at* https://www.middlesexsheriff.org/press-releases/news/sheriffs-announce-launch-landmark-medication-assisted-treatment-mat-pilot.
[44] *Id.*
[45] National Sheriffs' Association, *supra* note 38 at 29.
[46] *Id.*
[47] Lauren Brinkley-Rubinstein et al, *The benefits and implementation challenges of the first state-wide comprehensive medication for addictions program in a unified jail and prison setting*, Drug and Alcohol Dependence 205, at 3 (2019).

E.      **Before Being Incarcerated at MCI-Cedar Junction, Plaintiffs Were Each Diagnosed with Opioid Use Disorder and Prescribed Buprenorphine Maintenance Treatment Based on Their Individual Medical Needs.**

*Joseph Sclafani*

65.      Mr. Sclafani has been diagnosed with opioid use disorder, a serious medical need and recognized disability. His buprenorphine maintenance treatment is medically necessary. If untreated, Mr. Sclafani's opioid use disorder will likely result in relapse and a potentially fatal opioid overdose, among other things.

66.      Mr. Sclafani has struggled with opioid addiction for nearly twenty years.

67.      He tried straight detoxification numerous times but was never able to stay in active recovery long term. He also tried Vivitrol, but it did not work for him: it made him feel anxious and uncomfortable, and it did not reduce his cravings. And while he had some success with methadone treatment in the past, he was involuntarily withdrawn from the medication during a previous incarceration and suffered three months of excruciating withdrawal. Based on that experience, he does not want to return to a methadone treatment program.

68.      In July 2019, Dr. Smikle at Middlesex Recovery assessed Mr. Sclafani's medical, addiction and treatment history. Based on an individualized assessment of his medical needs, she prescribed 16mg per day of buprenorphine maintenance treatment for Mr. Sclafani's opioid use disorder. With the help of this buprenorphine maintenance treatment, which is medically

necessary for the treatment of his serious medical condition, Mr. Sclafani was able to achieve active recovery.

69.     Without access to this medically necessary treatment, Mr. Sclafani faces a high risk of relapse, overdose, and death.

*Michael Feinstein*

70.     Mr. Feinstein has been diagnosed with opioid use disorder, a serious medical need and recognized disability. His buprenorphine maintenance treatment is medically necessary. If untreated, Mr. Feinstein's opioid use disorder will likely result in relapse and potentially a fatal opioid overdose, among other things.

71.     Mr. Feinstein has struggled with opioid addiction for nearly half of his life.

72.     He tried straight detoxification at least a dozen times, but he was never able to remain in active recovery because it did not treat his underlying addiction. He also tried Vivitrol, but it made him feel very sick. Finally, methadone did not eliminate his cravings, and he experienced an incredibly painful withdrawal when he was involuntarily taken off the medication during a previous incarceration. Based on this experience, he does not want to return to a methadone treatment program.

73.     In May 2019, Nurse Practitioner Damien at High Point Treatment Center prescribed 12mg per day of  buprenorphine maintenance treatment for Mr. Feinstein's opioid use disorder based on an individualized evaluation of his needs. With the help of this buprenorphine

maintenance treatment, which is medically necessary for the treatment of his serious medical condition, Mr. Feinstein was able to achieve active recovery.

74.     Without access to this medically necessary treatment, Mr. Feinstein faces a high risk of relapse, overdose, and death.

*Bret Cappola*

75.     Mr. Cappola has been diagnosed with opioid use disorder, a serious medical need and recognized disability. His buprenorphine maintenance treatment is medically necessary. If untreated, Mr. Cappola's opioid use disorder will likely result in relapse and potentially a fatal opioid overdose, among other things.

76.     Mr. Cappola has struggled with opioid addiction since he was a teenager.

77.     He tried straight detoxification at a number of different treatment programs, but he was never able to remain in active recovery because it did not treat his underlying addiction. He also tried methadone, but it did not eliminate his cravings, and he experienced months-long withdrawal symptoms when he was involuntarily taken off the medication during a previous incarceration. Because of that experience, he does not want to return to a methadone treatment program.

78.     In June 2018, the medical providers at Franklin County House of Correction assessed Mr. Feinstein's medical, addiction, and treatment history. Based on an individualized assessment of his medical needs, the medical providers prescribed 16mg per day of buprenorphine maintenance treatment for Mr. Cappola's opioid use disorder. With the help of

this buprenorphine maintenance treatment, which is medically necessary for the treatment of his serious medical condition, Mr. Cappola was able to achieve active recovery.

79.     Without access to this medically necessary treatment, Mr. Cappola faces a high risk of relapse, overdose, and death.

**F.      Under its Compulsory-Withdrawal Policy, the Department of Correction Categorically and Arbitrarily Fails to Provide Buprenorphine Maintenance Treatment to Inmates with Opioid Use Disorder.**

80.     In March 2018, the U.S. Attorney for the District of Massachusetts initiated an ADA investigation of the Massachusetts DOC, explaining that it was doing so because "individuals in treatment for OUD entering DOC facilities, who are being treated with MAT, are not allowed to access MAT while in the DOC's custody."[48] The office emphasized "that all individuals in treatment for OUD, regardless of whether they are inmates or detainees, are already protected by the ADA, and [] the DOC has existing obligations to accommodate this disability."[49] That investigation remains open.

81.     The DOC's contracted healthcare vendor is Wellpath.

82.     On information and belief, Dr. Aysha Hameed is the only doctor who works in MCI-Cedar Junction's medical department, and she oversees the operations of that department.

83.     A DOC web site contains a Wellpath document labelled "medication assisted treatment protocol," which suggests that MAT may be continued during incarceration.[50]

84.     Nevertheless, it is not in fact DOC policy to allow incarcerated individuals  to continue receiving the MAT that they had been receiving before entering their custody.

---

[48] Letter from Andrew E. Lelling, United States Attorney, to David Solet, General Counsel, Executive Office of Public Safety and Security and Jesse Caplan, General Counsel, Executive Office of Health and Human Services (Mar. 16, 2018).
[49] *Id.*
[50] Wellpath, *Wellpath Medication Assisted Treatment Protocol*, *available at* https://www.mass.gov/doc/wellpath-medication-assisted-treatment-protocol/download.

85.     To the contrary, the actions and statements by the DOC and Wellpath demonstrate that DOC policy is to *deny* buprenorphine maintenance treatment for opioid use disorder, and in fact to compel *withdrawal* from such treatment.

86.     The DOC does not provide buprenorphine to criminally sentenced men struggling with opioid use disorder at any other correctional facility except for MCI-Cedar Junction.

87.     At MCI-Cedar Junction, the DOC automatically reduces individuals' buprenorphine doses to no more than 8mg per day; forcibly removes individuals from buprenorphine after just 90 days; and uniformly refuses to provide any further access to buprenorphine for the remaining months or years of their periods of incarceration until the final 90 days of their sentences.

88.     As the Deputy Superintendent of MCI-Cedar Junction Jodi Hockert-Lotz has explained, buprenorphine "is offered to inmates for their first 90 days of incarceration and is available as part of an inmate[']s release to the community."

89.     Under this compulsory-withdrawal policy, Plaintiffs and other individuals in DOC custody have been, or imminently will be, denied access to their buprenorphine maintenance treatment for opioid use disorder.

*Joseph Sclafani*

90.     Mr. Sclafani entered MCI-Cedar Junction on August 15, 2019.

91.     Dr. Hameed confirmed Mr. Sclafani's opioid use disorder diagnosis and that he had been prescribed 16mg per day of buprenorphine by his doctor in the community.

92.     Nevertheless, Dr. Hameed decreased Mr. Sclafani's prescription to 8mg per day, informed him that it would be further reduced by 2mg every 20 days, and said that she would

provide the medication for only 90 days total. She did not provide Mr. Sclafani with any medical

reason for the change in his dose or the 90-day limit.

93.     According Dr. Hameed's medical notes, Mr. Sclafani "will be tapered over a

period of 60-90 days. And that will be the end of his maintenance while in the DOC." Her

prescription notes describe Mr. Sclafani's dose as "OPIATE DETOX," and explain that the

prescription was "to complete maintenance dose for 90 days" or "to complete the 90 day course."

94.     Dr. Hameed told Mr. Sclafani that 8mg per day was the maximum daily dose at

MCI-Cedar Junction and that nobody could receive more than this dose for addiction treatment.

95.     She  also told Mr. Sclafani, "you will get 8mg, because that is the way it is here.

That is our policy." In addition, she informed him that no one was allowed to stay on

buprenorphine for addiction treatment at MCI-Cedar Junction for more than 90 days, and that the

medical providers were detoxing patients from buprenorphine rather than providing

buprenorphine maintenance treatment.

96.     As documented in her medical notes, Dr. Hameed told Mr. Sclafani that "prior to

discharge, we can reinstitute Suboxone program." Indeed, when in late October Mr. Sclafani told

her that his release date may be within 90 days, Dr. Hameed noted in her medical notes, "this

needs to be confirmed by the HSA discharge coordinator and classification." She went on to

record that if his release date was confirmed, his buprenorphine prescription "will not be

discontinued but will be continued and increased as the discharge date comes."

97.     Ultimately, Mr. Sclafani's release date was not within 90 days, , however, and Dr.

Hameed did not continue his buprenorphine prescription.

98.     Mr. Sclafani grieved the reduction and pending elimination of his buprenorphine

prescription. In a written response, the Health Services Administrator at Cedar Junction stated,

"we are only providing subutex here for up to 90 days." Mr. Sclafani appealed his forced

withdrawal along with another medical issue to the Wellpath Appeals Coordinator, but the

response he received only dealt with the other issue.

99.     The DOC reduced Mr. Sclafani's buprenorphine dose by 2mg every 20 days

between August and November, and terminated his buprenorphine prescriptions on November

17, 2019.

100.     On November 20, 2019, Mr. Sclafani was transferred to MCI-Norfolk, which

does not provide buprenorphine treatment for opioid use disorder. The facility's medical

providers have not provided Mr. Sclafani with access to buprenorphine.

*Michael Feinstein*

101.     Mr. Feinstein entered MCI-Cedar Junction on October 1, 2019.

102.     Dr. Hameed confirmed Mr. Feinstein's opioid use disorder and that he had been

prescribed 12mg per day of buprenorphine by his doctor in the community.

103.     As documented by MCI-Cedar Junction's mental health team, Mr. Feinstein

found "Suboxone helpful in maintaining sobriety from illicit substances" and reported that

during the last year of his sobriety, he felt "the healthiest and most clear headed I've felt in a

long, long time."

104.     Nevertheless, Dr. Hameed immediately dropped Mr. Feinstein's prescription to

4mg per day.

105.     When Mr. Feinstein first arrived at MCI-Cedar Junction, he saw a nurse

practitioner. She called the doctor, who told the nurse that he would be placed on 4mg per day

for a 90-day "taper."

106.    When Mr. Feinstein finally saw Dr. Hameed, she told him she would not answer
any questions about buprenorphine. Instead, she informed him that MCI-Cedar Junction's
buprenorphine program is a "90-day program at most," and that she believed no one needed to be
on a buprenorphine dose of more than 4mg per day. She did not provide Mr. Feinstein with any
medical reason for the 90-day limit or the change in his dose.

107.    When Mr. Feinstein said he thought he had a legal right to be adequately treated
for his serious medical condition, Dr. Hameed replied that she was not scared to go to court.

108.    According to Dr. Hameed's prescription notes, Mr. Feinstein's buprenorphine
prescription was "to complete 90 days maintenance dose."

109.    As documented in Dr. Hameed's medical records for Mr. Feinstein, she would
"prescribe Suboxone up to 90 days and prior to discharge[] to the community so that he is back
on Suboxone program to avoid overdose." She then reiterated, Mr. Feinstein "will be prescribed
Suboxone up to 90 days then restart Suboxone 60-90 days prior to release into the community."

110.    Pursuant to DOC policy, Mr. Feinstein is currently due to be forcibly removed
from buprenorphine entirely on January 6 or 7, 2020. Given what Dr. Hameed has told him, he
has not filed any grievances because he is terrified that the providers will retaliate against him or
remove him from his medication even earlier.

*Bret Cappola*

111.    Mr. Cappola entered MCI-Cedar Junction on September 26, 2019.

112.    The day he was admitted, his intake provider told him that he could only receive
buprenorphine for 90 days. When he responded that he had been told that he could stay on his
medication, she responded "oh no, it's a 90-day program. There is 90 days in and 90 days out."

113.    The medical and mental health teams confirmed Mr. Cappola's opioid use disorder and his 8mg per day buprenorphine prescription from the Hamden County House of Correction.

114.    Nevertheless, when Mr. Cappola met with a nurse practitioner, she told him that people above her were in control and that there was a 90-day limit on buprenorphine prescriptions for opioid use disorder. She put him on an 8mg per day dose, and said this was the maximum dosage at Cedar Junction. She did not provide Mr. Cappola with any medical reason for his dose or the 90-day limit.

115.    Another nurse practitioner at MCI-Cedar Junction similarly asked Mr. Cappola "you know this is only a 90-day program, right?" The nurse practitioner informed Mr. Cappola that "higher ups" had set this policy.

116.    As reflected in a DOC "medical restrictions" form signed by Deputy Superintendent Jodi Hockert-Lotz, the DOC will keep Mr. Cappola on buprenorphine for "90 days" between "9/30/19" and "12/30/19".

117.    Thus, pursuant to DOC policy, Mr. Cappola is currently due to be forcibly removed from buprenorphine on December 30, 2019.

118.    Mr. Cappola has not filed any grievances because he is terrified that they will retaliate against him or remove him even earlier from his medication if he submits a grievance.

119.    Instead, Mr. Cappola wrote a letter to Wellpath asking to stay on his buprenorphine maintenance treatment, because he thought this plea for help would be less threatening than a grievance. In a written response, the Health Services Administrator at MCI-Cedar Junction acknowledged his "request[] to be continued on your current dose of subutex,"

but stated "[h]ere at Cedar Junction we are required to keep patients on the maintenance dose for the first 90 days they are here and then we can restart them when they are in their last 90 days."

*Other Individuals Struggling with Opioid Use Disorder at MCI-Cedar Junction*

120.    Jonathan Howlett is currently incarcerated at MCI-Cedar Junction. He has been diagnosed with opioid use disorder. Before he entered DOC custody, his doctor in the community prescribed 22mg per day of buprenorphine to help treat this chronic disease.

121.    Dr. Hameed prescribed 4mg per day of buprenorphine for Mr. Howlett. His prescription is set to expire on January 6, 2019. Dr. Hameed informed Mr. Howlett that MCI-Cedar Junction will only provide buprenorphine for a maximum of 90 days, and that no one at the facility is allowed to get more than 8mg per day.

122.    Mr. Howlett wrote to Defendant DeMoura to ask to receive buprenorphine maintenance treatment throughout his incarceration. In a written response, Deputy Superintendent Jodi Hockert-Lotz stated, "[a]t this time the treatment program is offered to inmates for their first 90 days of incarceration and is available as part of an inmate[']s release to the community."

123.    Peter Wallace was admitted to MCI-Cedar Junction on September 16, 2019 and released on December 10, 2019. He has been diagnosed with opioid use disorder.

124.    When Mr. Wallace first arrived at MCI-Cedar Junction, he asked for access to buprenorphine maintenance treatment. The medical providers at MCI-Cedar Junction informed him that he had to wait until he had 90 days left in his sentence, at which point they would begin to provide him with buprenorphine in anticipation of his release.

125. Both Dr. Hameed and Mr. Wallace's mental health provider at MCI-Cedar Junction told Mr. Wallace that buprenorphine was provided at the facility only for the first and last 90 days of incarceration.

**G. Defendants Mici and DeMoura Have Segregated Plaintiffs and Denied Them the Benefits of Services, Programs, and Activities Available to Other Prisoners**

126. As a general rule, MCI-Cedar Junction houses prisoners receiving buprenorphine on Block 5.

127. Block 5 is a maximum-security block. Whereas other prisoners who are not prescribed buprenorphine spend a short time at the beginning of their sentences on a maximum-security block, Plaintiffs are forced to remain on Block 5, and therefore in a maximum-security setting, the entire time they receive buprenorphine. As a result, prisoners who are receiving buprenorphine and are housed on Block 5 do not have access to the regular canteen and cannot have contact visits with their family members during their entire stay at MCI-Cedar Junction.

128. Prisoners who are housed on Block 5 because they are receiving buprenorphine also have less access to prison work and other programs and activities, including drug counseling, than other prisoners who are not prescribed buprenorphine. This denies them the opportunity to earn up to fifteen days per month of good-time sentence reduction credit, as well as the physical and mental advantages of being able to work and receive counseling.

129. Mr. Sclafani was not able to access drug and alcohol programming until the very end of his time on Block 5. As a result, he earned less good-time sentence reduction credit.

130. Because Mr. Sclafani and his wife did not want his four-year-old son to have to experience speaking with his father through a prison telephone during a non-contact visit, he was not able to see his son throughout his time at MCI-Cedar Junction.

131.    Mr. Feinstein has not been able to get a job or access drug and alcohol programming throughout his time on Block 5. As a result, he was and is unable to earn good-time sentence reduction credit.

132.    At his community provider, Mr. Feinstein received counseling to complement his buprenorphine maintenance treatment, and he would like to participate in counseling during his incarceration.

133.    Mr. Cappola has not been able to get a job or access drug and alcohol programming throughout his time on Block 5. As a result, he was and is unable to earn good-time sentence reduction credit.

**H.      Without Judicial Intervention, Plaintiffs Will Continue to Be Denied Medically Necessary Treatment for Their Opioid Use Disorder While Incarcerated in a Department of Correction Facility.**

134.    Under its policy, the DOC has already discontinued Mr. Sclafani's buprenorphine prescription and will imminently do the same for both Mr. Feinstein and Mr. Cappola.

135.    Without access to this medically necessary treatment, Plaintiffs face a high risk of relapse, overdose, and death both during their incarceration and upon their release.

136.    The DOC's compulsory-withdrawal policy also has forced or will imminently force Plaintiffs into a situation where the only way they can avoid excruciating withdrawal symptoms and an increased risk of relapse, overdose, and death is to purchase their life-saving buprenorphine on the black market inside DOC facilities, thereby exposing themselves to potential DOC discipline, retaliation, and an increased period of incarceration.

137.    On December 6, 2019, Plaintiffs' counsel sent a letter to Defendants informing them of Plaintiffs' serious medical needs and requesting assurance that, for the duration of their incarceration in DOC custody, Plaintiffs will be provided with buprenorphine maintenance

treatment at the dosages previously prescribed by their medical providers based on individualized considerations of their medical needs.

138.    In a letter dated December 13, 2019, Defendants refused to provide such assurances. Instead, contrary to the facts communicated to Plaintiffs and other prisoners by the DOC's own agents, DOC Assistant Deputy Commissioner for Clinical Services Stephanie Sullivan asserted that "[t]here is no policy proscription of which the DOC is aware that restricts either the dosage or length of treatment for which an individual inmate may receive medically necessary MAT."

139.    Accordingly, the relevant officials at the DOC have been informed of Plaintiffs' diagnoses and their need for medical treatment, but it appears that Defendants will not provide such treatment during Plaintiffs' periods of incarceration at DOC facilities.

### COUNT I – EIGHTH AMENDMENT
**(All Defendants - Deliberate Indifference to Serious Medical Need)**

140.    The foregoing allegations are re-alleged and incorporated herein.

141.    Defendants, while acting under color of state law, deliberately, purposefully, and knowingly deny Plaintiffs access to necessary medical treatment for their opioid use disorder, which is a serious medical need.

142.    Defendants' compulsory-withdrawal policy automatically and forcibly removes individuals in their custody from their prescribed buprenorphine maintenance treatment.

143.    Denying Plaintiffs access to buprenorphine maintenance treatment for their opioid use disorder has caused and will cause them physical and psychological suffering, will expose them to heightened risk for other serious medical conditions, and could trigger relapse into active addiction, potentially resulting in relapse, overdose, and death.

144.    As applied to Plaintiffs, Defendants' failure to adhere to standards of care amounts to deliberate indifference to a serious medical need, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

## COUNT II – AMERICANS WITH DISABILITIES ACT
**(All Defendants - Unlawful Discrimination Against Qualified Individuals with Disabilities: Denial of Medical Services)**

145.    The foregoing allegations are re-alleged and incorporated herein.

146.    The Department of Correction and its facilities at MCI-CJ and MCI-Norfolk, which are overseen and/or run by Defendants, are public entities subject to the Americans with Disabilities Act (ADA).

147.    Drug addiction is a "disability" under the ADA. *See* 42 U.S.C. §§ 12102 and 12131(2); 28 C.F.R. § 35.108 (the phrase "physical or mental impairment includes, but is not limited to . . . drug addiction, and alcoholism.").

148.    The ADA applies to people, like Plaintiffs, who suffer from opioid use disorder.

149.    On information and belief, Defendants do not forcibly deny or alter medically necessary, physician-prescribed medications to inmates with other serious, chronic medical conditions, such as diabetes.

150.    Defendants' compulsory-withdrawal policy automatically and forcibly removes individuals in their custody from their prescribed buprenorphine maintenance treatment.

151.    Defendants deny Plaintiffs the benefits of the Massachusetts Department of Correction's medical programs on the basis of their disabilities.

152.    Defendants refuse to make a reasonable accommodation for Plaintiffs by providing them with access to their prescribed MAT medication during their incarceration, even though accommodation would not alter the nature of the healthcare program.

## COUNT III – AMERICANS WITH DISABILITIES ACT
### (Defendants Mici and DeMoura - Unlawful Discrimination Against Qualified Individuals with Disabilities: Denial of Most Integrated Setting and Access to Services, Programs, and Activities)

153.    The foregoing allegations are re-alleged and incorporated herein.

154.    The ADA requires correctional facilities to "ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.152(b)(1).

155.    The ADA requires correctional facilities to "ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals," and forbids correctional institutions from "plac[ing] inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed." 28 C.F.R. § 35.152(b)(2).

156.    Defendants Mici and DeMoura discriminate against Plaintiffs by segregating them to Block 5, thereby excluding Plaintiffs from participation in, and denying them the benefits of, services, programs, and activities available to prisoners who are housed in other Blocks because they are not prescribed buprenorphine, including work programs, substance use programming, and contact visits.

157.    Defendants Mici and DeMoura fail to house Plaintiffs in the most integrated setting appropriate to their needs. On the basis of Plaintiffs' disability, Defendants Mici and DeMoura kept Plaintiffs in Block 5, which does not offer the same programs as the facilities where Plaintiffs would be housed if they were not prescribed buprenorphine.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs asks this Court to GRANT the following relief:

1.      Emergency, preliminary, and permanent injunctive relief ordering Defendants to provide Plaintiffs with access to their buprenorphine maintenance treatment, at doses prescribed by their medical providers, during their entire terms of incarceration;

2.      Emergency, preliminary, and permanent injunctive relief ordering that Defendants cannot discipline or retaliate against Plaintiffs for obtaining buprenorphine while in DOC custody during any period of time when Defendants were not providing Plaintiffs with buprenorphine maintenance treatment;

3.      Permanent injunctive relief ordering Defendants to provide Plaintiffs the benefits of the services, programs, and activities available to non-disabled prisoners, including work programs, substance use programming, and contact visits, and to house Plaintiffs in the most integrated setting appropriate to their needs;

4.      A declaratory judgment holding that, as applied to Plaintiffs, Defendants' policy of denying buprenorphine maintenance treatment for opioid use disorder violates the Eighth Amendment;

5.      A declaratory judgment holding that, as applied to Plaintiffs, Defendants' policy of denying buprenorphine maintenance treatment for opioid use disorder violates the ADA;

6.      A declaratory judgement holding that Defendants Mici's and DeMoura's segregation of Plaintiffs and refusal to provide them access to the benefits of the services, programs, and activities available to non-disabled prisoners violates the ADA;

7.      Awarding Plaintiffs their attorneys' fees and costs;

8.      Any further relief this Court deems just and proper.

Respectfully submitted,

JOSEPH SCLAFANI, MICHAEL FEINSTEIN,
and BRET CAPPOLA

By their attorneys,


/s/ Robert Frederickson III
Robert Frederickson III (BBO 670111)
Marielle Sanchez (BBO 703897)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.:  617.570.1000
Fax:  617.523.1231
RFrederickson@goodwinlaw.com
MSanchez@goodwinlaw.com

Ira J. Levy (*Pro hac vice* pending)
Alexandra D. Valenti (*Pro hac vice* pending)
Aviv A. Zalcenstein (*Pro hac vice* pending)
Christine Armellino (*Pro hac vice* pending)
GOODWIN PROCTER LLP
The New York Times Building
620 Eight Avenue
New York, NY 10018
Tel.:  212.813.8800
Fax:  212.355.3333
ILevy@goodwinlaw.com
AValenti@goodwinlaw.com
AZalcenstein@goodwinlaw.com
CArmellino@goodwinlaw.com

Matthew R. Segal (BBO 654489)
Jessie J. Rossman (BBO 670685)
Laura K. McCready (BBO 703692) (*Pro hac vice*
pending)
American Civil Liberties Union
Foundation of Massachusetts, Inc.
211 Congress Street
Boston, MA 02110
Tel.:  617.482.3170
msegal@aclum.org
jrossman@aclum.org
lmccready@aclum.org

*Attorneys for Plaintiffs Joseph Sclafani, Michael Feinstein, and Bret Cappola*

Dated:   December 19, 2019