**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOSEPH SCLAFANI, MICHAEL FEINSTEIN, and BRET CAPPOLA | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| CAROL A. MICI, in her official capacity as Commissioner of the Massachusetts Department of Correction, DOUGLAS DEMOURA, in his official capacity as Superintendent of MCI-Cedar Junction, and STEVE SILVA, in his official capacity as Superintendent of MCI-Norfolk, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

C.A. No. _____

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 2

    A. Opioid Use Disorder Is a Serious Medical Need and a Public Health Crisis. ............ 2

    B. MAT Is the Standard of Care for Treating OUD. ........................................................ 3

    C. Plaintiffs' Buprenorphine MAT Is Medically Necessary to Treat Their OUD. .......... 4

    D. Absent Judicial Intervention, the DOC's Compulsory-Withdrawal Policy Will
       Continue to Deny Buprenorphine Maintenance Treatment to Plaintiffs. .................... 5

    E. Providing MAT To Prisoners With OUD Has Had Demonstrable Success. ............... 7

I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................................... 8

    A. Plaintiffs Are Likely to Show That Defendants' Denial of Maintenance MAT
       Constitutes Deliberate Indifference to a Serious Medical Need in Violation of
       the Eight Amendment. ................................................................................................. 8

         *1. Plaintiffs Are Likely to Satisfy the Objective Prong.* ....................................... 9

         *2. Plaintiffs Are Likely to Satisfy the Subjective Prong.* .................................... 12

    B. Plaintiffs Are Likely to Succeed on the Merits of Their ADA Claim for Denial
       of Buprenorphine Maintenance Treatment. ............................................................... 13

         *1. Plaintiffs Are Qualified Individuals with Disabilities.* .................................... 13

         *2. Plaintiffs Are Being Denied the Benefit of Health-Care Programs and
            Discriminated Against Because of Their Disability.* ....................................... 14

    C. Plaintiffs' Claims Are Not Barred by an Exhaustion Requirement. .......................... 16

II.  PLAINTIFFS FACE IMMEDIATE IRREPARABLE INJURY ......................................... 18

III. THE BALANCE OF THE HARDSHIPS FAVORS PLAINTIFFS ................................... 19

IV. THE PUBLIC INTEREST STRONGLY FAVORS INJUNCTIVE RELIEF ...................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*725 Eatery Corp. v. City of New York*,
No. 02-cv-4431, 2019 WL 4744218 (S.D.N.Y. Sept. 30, 2019) ..............................................8

*Brown v. Plata*,
563 U.S. 493 (2011) ..............................................................................................................8

*Buchanan v. Maine*,
469 F.3d 158 (1st Cir. 2006) ...............................................................................................13

*Estelle v. Gamble*,
429 U.S. 97 (1976) ................................................................................................................8

*Fletcher v. Tufts University*,
367 F. Supp. 2d 99 (D. Mass. 2005) .....................................................................................15

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014) (*en banc*)..........................................................................9, 11, 12

*Largess v. Supreme Judicial Court for State of Mass.*,
317 F. Supp. 2d 77 (D. Mass. 2004) ......................................................................................7

*Lesley v. Hee Man Chie*,
250 F.3d 47 (1st Cir. 2001) ..................................................................................................15

*McNally v. Prison Health Servs.*,
46 F. Supp. 2d 49 (D. Me. 1999) ..........................................................................................15

*Miranda-Rivera v. Toledo- Davila*,
813 F.3d 64 (1st Cir. 2016) ....................................................................................................9

*Nunes v. Mass. Dep't of Correction*,
766 F.3d 136 (1st Cir. 2014) ................................................................................................16

*Pennsylvania Dep't of Corrections v. Yeskey*,
524 U.S. 206 (1998) .......................................................................................................13, 14

*Pesce v. Coppinger*,
355 F. Supp. 3d 35 (D. Mass. 2018) ......................................................................... *passim*

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
397 F.3d 56 (1st Cir. 2005) ..................................................................................................19

*Ross v. Blake*,
   136 S. Ct. 1850 (2016)..................................................................17, 18

*Smith v. Aroostook Cty.*,
   376 F. Supp. 3d 146 (D. Me. 2019) ..................................... *passim*

*Smith v. Aroostook Cty.*,
   922 F.3d 41 (1st Cir. 2019)....................................................................2

*Soneeya v. Spencer*,
   851 F. Supp. 2d 228 (D. Mass. 2012) ...........................................9, 10

*Theriault v. Flynn*,
   162 F.3d 46 (1st Cir. 1998)...................................................................15

*West v. Atkins*,
   487 U.S. 42 (1988)..................................................................................9

*Winter v. Nat. Res. Defense Council, Inc.*,
   555 U.S. 7 (2008)....................................................................................7

**Statutes**

42 U.S.C. § 1983 ........................................................................................17

42 U.S.C. § 1997e(a) (2013) ......................................................................17

42 U.S.C. § 12102(1)(A)...........................................................................14

42 U.S.C. §§ 12131(1)(B), 12132 ..............................................................13

42 U.S.C. § 12210......................................................................................14

**Other Authorities**

28 C.F.R. § 35.108(b)(2)............................................................................14

28 C.F.R. § 35.130(b)(1).............................................................................13

28 C.F.R. § 35.130(b)(7)(1).......................................................................16

28 C.F.R. § Pt. 35, App. A.........................................................................13

103 Code Mass. Regs. § 491.11.................................................................17

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Cappola Decl. ¶ __ | Declaration of Bret Cappola[1] |
| Consoli Decl. ¶ __ | Declaration of Andrew Consoli |
| D. Cappola Decl. ¶ __ | Declaration of Deborah Cappola |
| Feinstein Decl. ¶ __ | Declaration of Michael Feinstein |
| Frederickson Decl., Ex. __ | Exhibit to the Declaration of Robert Frederickson III In Support Of Plaintiffs' Emergency Motion For A Temporary Restraining Order And Preliminary Injunction |
| Howlett Decl. ¶ __ or Howlett Decl., Ex. __ | Declaration of Jonathan Howlett, or Exhibit thereto |
| M. Sclafani Decl. ¶ __ | Declaration of Melissa Sclafani |
| P. Feinstein Decl. ¶ __ | Declaration of Peter Feinstein |
| Potee Decl. ¶ __ or Potee Decl., Ex. __ | Declaration of Ruth A. Potee, M.D., or Exhibits thereto |
| Sclafani Decl. ¶ __ | Declaration of Joseph Sclafani |
| Walley Decl. ¶ __ | Declaration of Alexander Yale Walley, M.D., M.Sc. |
| ADA | Americans with Disabilities Act |
| DOC | Massachusetts Department of Correction |
| FDA | U.S. Food and Drug Administration |
| MASAC | Massachusetts Alcohol and Substance Abuse Center |
| MAT | Medication for Addiction Treatment |
| MCI-F | MCI-Framingham |
| OUD | Opioid Use Disorder |
| SAMHSA | Substance Abuse and Mental Health Services Administration |

---

[1] All Declarations referenced in this Table of Abbreviations are being submitted concurrently herewith.

| | |
|---|---|
| SMCC | South Middlesex Correctional Center |
| WHO | World Health Organization |

# INTRODUCTION

Plaintiffs Joseph Sclafani, Michael Feinstein, and Bret Cappola are prisoners who suffer from opioid use disorder, a life-threatening, chronic medical disease. Although incurable, this disease is treatable. The FDA has approved three medications—buprenorphine, methadone, and naltrexone—that are used in the standard of care for treating OUD: medication for addiction treatment. Before being imprisoned at MCI-Cedar Junction, Plaintiffs were each receiving prescription buprenorphine maintenance treatment, through which they each achieved active recovery from OUD. But upon entering the custody of the Massachusetts Department of Correction, Plaintiffs were subjected to DOC policy, which is to *withdraw* buprenorphine maintenance treatment rather than to *provide* it. This compulsory-withdrawal policy violates the Eighth Amendment and the Americans with Disabilities Act.

The DOC's compulsory-withdrawal policy takes buprenorphine medication away from prisoners within 90 days of incarceration. To implement this policy, the DOC (1) immediately reduces prisoners' buprenorphine doses to no more than 8mg per day, (2) arbitrarily removes prisoners from buprenorphine entirely after just 90 days, and (3) categorically bars further access to buprenorphine for the remaining months or years of their incarceration, except for the final 90 days. The potential consequences of this policy are grave: forcibly removing individuals from buprenorphine maintenance treatment triggers excruciating withdrawal symptoms and an increased risk of relapse, overdose, and death.

Pursuant to its policy, the DOC has already discontinued Mr. Sclafani's buprenorphine prescription, and will imminently do so for Mr. Feinstein (on or about December 30) and Mr. Cappola (on or about January 6 or 7). Plaintiffs consequently face an impossible choice: they can undergo agonizing withdrawal and forego their life-saving medication, or they can try to obtain it

through the prison's black market, thereby risking DOC discipline, retaliation, and longer incarceration. Absent an injunction, Plaintiffs will continue to face this choice every day. Accordingly, Plaintiffs seek emergency injunctive relief requiring the DOC to provide them with their medically necessary buprenorphine maintenance treatment for the duration of their sentences.

This requested relief is both practical—buprenorphine is already available at MCI-Cedar Junction, just as it is in Houses of Correction for seven Massachusetts counties—and consistent with case law. In *Smith v. Aroostook Cty.*, 922 F.3d 41, 42 (1st Cir. 2019), the First Circuit affirmed a preliminary injunction requiring a Maine county correctional facility to provide a prisoner with continued access to buprenorphine maintenance treatment, despite a policy there banning such treatment, where the district court had found that denying the medication likely violated the ADA. *See also Smith v. Aroostook Cty.*, 376 F. Supp. 3d 146, 149 (D. Me. 2019). And in *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass. 2018), this Court granted a similar injunction, requiring a Massachusetts county correctional facility to provide a prisoner with continued access to methadone maintenance treatment because denying methadone likely violated both the Eighth Amendment and the ADA. This Court should reach the same outcome here, and for the same reasons: DOC's compulsory-withdrawal policy violates the Eighth Amendment (as alleged in Count I of Plaintiffs' Complaint) and the ADA (as alleged in Count II), and the other equitable factors also favor relief.

## STATEMENT OF FACTS

### A. Opioid Use Disorder Is a Serious Medical Need and a Public Health Crisis.

OUD is a chronic brain disease. Potee Decl. ¶ 5. Its symptoms typically include cravings, increasing tolerance to opioids, withdrawal symptoms, and a loss of control. *See id.* ¶¶ 9–11. Without treatment, people with OUD often cannot control their use of opioids. *See id.* ¶ 11.

Genetic factors account for much of a person's vulnerability to addiction, as does early exposure and childhood trauma. *Id.* ¶ 8. More than half a million people have died from opioid overdose in the last twenty years, and the death toll has risen exponentially since 2013. *Id.* ¶ 6. The situation in Massachusetts is particularly dire. There were 2,033 confirmed and estimated opioid-related overdose deaths in Massachusetts in 2018, an average of more than five per day. *Id.* ¶ 7.

As the President's Commission on Combating Drug Addiction and the Opioid Crisis recognized, OUD is especially dangerous for people who are or have been incarcerated. *See* Frederickson Decl., Ex. 1 at 72; Potee Decl. ¶ 33. In 2015, nearly 50 percent of all deaths among those released from incarceration were opioid-related. *Id.* A recent study by the Massachusetts Department of Public Health found that "[t]he opioid overdose death rate is *120 times higher* for those recently released from incarceration compared to the rest of the adult population." Potee Decl. ¶ 33, Ex. 13 at 50 (emphasis added).

### B.    MAT Is the Standard of Care for Treating OUD.

The standard of care for treating OUD is MAT, which is the use of FDA-approved drugs that can be used in conjunction with counseling and other interventions. Potee Decl. ¶ 13; Walley Decl. ¶ 6. The primary driver in MAT's efficacy is the medication itself. Potee Decl. ¶ 13; Walley Decl. ¶ 6. The three FDA-approved medications for treating this disease are methadone, buprenorphine (Suboxone or Subutex), and naltrexone (Vivitrol). Potee Decl. ¶¶ 14–15; Walley Decl. ¶ 5. Methadone and buprenorphine activate opioid receptors to relieve withdrawal symptoms and control cravings. Potee Decl. ¶ 15. Naltrexone, in contrast, blocks opioid receptors, preventing opioids from producing euphoric effects. *Id.* ¶ 14.

Not every medication works equally well for each patient, so if one form of MAT is working for a patient, involuntarily terminating it violates the standard of care. *Id.* ¶ 18; Walley Decl. ¶7. The dose and duration of buprenorphine maintenance treatment must be based on a

medical provider's individualized assessment of a particular patient's medical needs. Potee Decl. ¶ 18; Walley Decl. ¶ 11. Like treatments for other chronic diseases, MAT maintenance is generally lengthy, and sometimes lifelong. Potee Decl. ¶17; Walley Decl. ¶ 11.

Buprenorphine can also be used for medically managed withdrawal, which differs significantly from MAT. Walley Decl. ¶¶ 14–15. Unlike MAT, medically managed withdrawal does not treat OUD—it attempts to ease the physical symptoms of withdrawal for a limited time by tapering a patient off MAT or an illicit opioid—and it does not improve long-term outcomes for individuals struggling with OUD. *Id.* In contrast, MAT's effectiveness at treating OUD is well documented, and has been shown to decrease opioid use and opioid-related overdose deaths. Potee Decl. ¶ 40. For this reason, many government entities have recognized the necessity of MAT, including the Department of Health and Human Services, the FDA, the National Institute on Drug Abuse, the President's Commission on Combating Drug Addiction and the Opioid Crisis, the Office of National Drug Control Policy, and SAMHSA. Walley Decl. ¶ 6.

### C. Plaintiffs' Buprenorphine MAT Is Medically Necessary to Treat Their OUD.

Plaintiffs have all been diagnosed with OUD and have suffered from opioid addiction for many years. Each has tried other methods, including straight detoxification, methadone, and naltrexone, but they have found that buprenorphine maintenance treatment works best for them. Thus, before they were in DOC custody, Mr. Sclafani, Mr. Feinstein, and Mr. Cappola were all receiving buprenorphine maintenance treatment prescribed by their medical providers based on individualized assessments of their medical needs. With the help of this life-saving treatment, Plaintiffs were able to enter a state of active recovery. Without access to this medically necessary treatment, Plaintiffs face a high risk of relapse, overdose, and death.

**D.    Absent Judicial Intervention, the DOC's Compulsory-Withdrawal Policy Will Continue to Deny Buprenorphine Maintenance Treatment to Plaintiffs.**

The DOC's compulsory-withdrawal policy imposes just such a risk. As demonstrated by the consistent actions and statements by the DOC and its contracted healthcare provider, Wellpath, the DOC's policy mandates compulsory *withdrawal*, while denying buprenorphine maintenance *treatment* for opioid use disorder. Walley Decl. ¶¶ 15–16.

MCI-Cedar Junction is the only DOC correctional facility for men that is equipped to provide buprenorphine for OUD, but it nevertheless does not allow buprenorphine maintenance treatment.[2] Instead, as MCI-Cedar Junction's Deputy Superintendent has explained, buprenorphine "is offered to inmates for their first 90 days of incarceration and is available as part of an inmate[']s release to the community." Howlett Decl., Ex. 1. Thus, at MCI-Cedar Junction, the DOC automatically reduces buprenorphine doses to no more than 8mg per day; arbitrarily removes prisoners from buprenorphine after just 90 days; and uniformly refuses to provide any further access to buprenorphine for the remainder of their incarceration until the final 90 days of their sentences. In other words, the DOC terminates rather than provides buprenorphine maintenance treatment.

Under this policy, the DOC has already discontinued Mr. Sclafani's buprenorphine prescription and will imminently do the same for both Mr. Feinstein and Mr. Cappola. Specifically, MCI-Cedar Junction halved Mr. Sclafani's 16mg per day buprenorphine dose when he entered the facility in late August and entirely discontinued his prescription on November 17, 2019. Sclafani Decl. ¶¶ 21–23, 39. He has since been transferred to MCI-Norfolk, which does

---

[2] The DOC provides buprenorphine to women at MCI-F and SMCC and to men at the MASAC. MASAC houses men who are civilly committed for addiction to drugs and alcohol, although some men with minimum security status are also housed there on the workforce. Frederickson Decl. Ex. 5 at 4.

not provide buprenorphine to individuals suffering from OUD. When Mr. Feinstein entered MCI-Cedar Junction, his dose was similarly cut from 12mg per day to 4mg, and he is due to be forcibly removed from his prescription on or about January 6 or 7. Feinstein Decl. ¶¶ 23–24. Finally, the DOC offered Mr. Cappola just 8mg per day when he arrived at MCI-Cedar Junction, and will forcibly terminate prescription on or about December 30. Cappola Decl. ¶ 29.

Without access to their buprenorphine maintenance treatment, Plaintiffs face a high risk of relapse, overdose, and death, both during incarceration and upon release. DOC policy has thus forced, or will imminently force, Plaintiffs into a situation where they can avoid excruciating withdrawal symptoms and an increased risk of relapse, overdose, and death only by purchasing buprenorphine on the black market inside DOC facilities, thereby exposing themselves to potential DOC discipline, retaliation, and an increased period of incarceration.

On December 6, 2019, Plaintiffs' counsel sent a letter to Defendants informing them of Plaintiffs' serious medical needs and requesting assurance that, for the duration of their incarceration in the DOC's custody, Plaintiffs will be provided with buprenorphine maintenance treatment at the dosages previously prescribed by their medical providers based on individualized considerations of their medical needs. Frederickson Decl., Ex. 2. In response, Defendants have provided no such assurance. Instead, by letter dated December 13, 2019, the DOC's Assistant Deputy Commissioner for Clinical Services asserted that "Wellpath is solely responsible for making decisions" about the medications that prisoners receive, and that "[t]here is no policy proscription of which the DOC is aware that restricts either the dosage or length of treatment for which an individual inmate may receive medically necessary MAT." Frederickson Decl., Ex. 3. These assertions are contrary to the facts communicated to Plaintiffs by the DOC's own agents.

### E. Providing MAT To Prisoners With OUD Has Had Demonstrable Success.

Defendants' compulsory-withdrawal policy stands in stark contrast to the positive results other correctional institutions have experienced by offering maintenance MAT. Seven Houses of Correction in Massachusetts now provide buprenorphine and methadone maintenance treatment for opioid use disorder to individuals in their custody throughout their sentences. Potee Decl. ¶ 37. Prisoners at Rikers Island, New York and King County, Washington, have received maintenance MAT for years, and the Rhode Island and Vermont Departments of Correction make maintenance MAT available to all prisoners suffering from OUD, including those who did not enter their custody with a MAT prescription. *Id.* These programs have profoundly helped incarcerated people suffering from OUD and their communities. For example, Rhode Island experienced clinically meaningful reductions in overdose-related deaths both post-release and statewide. *Id.* ¶ 40. Reflecting the strength of the consensus that MAT is administrable in jails and prisons, the U.S. Attorney initiated an ADA-investigation of DOC for its failure to provide MAT to incarcerated people in March 2018. The U.S. Attorney emphasized "that all individuals in treatment for OUD, regardless of whether they are inmates or detainees, are already protected by the ADA," and that "the DOC has existing obligations to accommodate this disability." Frederickson Decl., Ex. 4. That investigation remains open.

### ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). These factors also govern a motion for a temporary restraining order. *See Largess v. Supreme Judicial Court for State of Mass.*, 317 F. Supp. 2d 77, 80–81 (D. Mass. 2004). Under this standard, this Court in *Pesce* granted a

preliminary injunction to a man suffering from OUD who challenged, on Eighth Amendment and ADA grounds, a county house of correction's blanket policy denying methadone maintenance treatment. *See* 355 F. Supp. 3d at 39; *see also Aroostook Cty.*, 376 F. Supp. 3d at 149. This Court should grant a similar injunction here, as all factors weigh in Plaintiffs' favor.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

To obtain preliminary injunctive relief, Plaintiffs need only show that they are likely to succeed on one of the claims at issue. *See, e.g.*, *725 Eatery Corp. v. City of New York*, No. 02-cv-4431, 2019 WL 4744218, at *23 (S.D.N.Y. Sept. 30, 2019). Here, Plaintiffs are likely to succeed on both. First, Plaintiffs are likely to prove that Defendants, pursuant to the DOC's compulsory-withdrawal policy, are deliberately indifferent to Plaintiffs' serious medical needs in violation of the Eighth Amendment. Second, Plaintiffs are likely to prove that, as applied to them, the DOC's compulsory-withdrawal policy constitutes unlawful discrimination under the ADA.

### A. Plaintiffs Are Likely to Show That Defendants' Denial of Maintenance MAT Constitutes Deliberate Indifference to a Serious Medical Need in Violation of the Eight Amendment.

Plaintiffs are likely to succeed on their Eighth Amendment claim that denying access to their buprenorphine maintenance treatment is cruel and unusual punishment. Because "society takes from prisoners the means to provide for their own needs," prisoners "are dependent on the State for food, clothing, and necessary medical care." *Brown v. Plata*, 563 U.S. 493, 510 (2011). "Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care." *Id.* at 510–11. "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Id.* at 511. Prison officials thus have an affirmative obligation to provide prisoners with medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate

medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *West v. Atkins*, 487 U.S. 42, 56 (1988). An Eighth Amendment claim has objective and subjective elements. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (*en banc*). Objectively, Plaintiffs must prove a serious medical need for which "adequate care has not been provided." *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 241 (D. Mass. 2012). Subjectively, Plaintiffs must prove that Defendants are deliberately indifferent to that serious medical need. *Id.* at 241–42. Plaintiffs are likely to satisfy both elements.

> 1.    *Plaintiffs Are Likely to Satisfy the Objective Prong.*

Plaintiffs are reasonably likely to satisfy the Eighth Amendment's objective inquiry. *See Pesce*, 355 F. Supp. 3d at 47 (plaintiff was "reasonably likely to satisfy the objective inquiry" because "the methadone treatment he would be denied" pursuant to a prison policy "has been documented as the only adequate treatment for his opioid use disorder").

First, OUD is a serious medical need. A medical need is "serious" if it "is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 74 (1st Cir. 2016). The DOC has confirmed that each Plaintiff has OUD, a chronic brain disease that kills more than one hundred Americans every single day. Sclafani Decl. ¶ 23; Feinstein Decl. ¶ 4; Cappola Decl. ¶ 19; Potee Decl. ¶ 6; Frederickson Decl., Ex. 7 at 7-5, Ex. 8 at 8-4, Ex. 9 at 9-5.

Second, buprenorphine maintenance treatment is medically necessary to adequately treat Plaintiffs' OUD. As confirmed by the DOC, before entering MCI-Cedar Junction, Plaintiffs were each prescribed buprenorphine maintenance treatment. Frederickson Decl., Ex. 7 at 7-4, Ex. 8 at 8-8, Ex. 9 at 9-3. Their medical providers prescribed this treatment because they determined it was medically necessary to treat Plaintiffs' OUD. Smikle Decl. ¶¶ 7–10; Damien Decl. ¶ 6;

Potee Decl. ¶ 45. That MAT is the standard of care to treat OUD is widely acknowledged, including by the Department of Health and Human Services, the National Institute on Drug Abuse, the FDA, SAMHSA, and WHO. Walley Decl. ¶ 6. For Plaintiffs, this life-saving treatment helped them achieve active recovery. Sclafani Decl. ¶¶ 16–19; Feinstein Decl. ¶¶ 18–20; Cappola Decl. ¶¶ 20–21. Once a patient is successfully recovering using buprenorphine maintenance treatment, involuntarily halting that medication contradicts sound medical practice and professional standards of care. Potee Decl. ¶ 21; Walley Decl. ¶ 12.

Directly contradicting Plaintiffs' own medical providers and the weight of medical authority, the DOC's compulsory-withdrawal policy categorically denies Plaintiffs access to adequate medical care. Under the Eighth Amendment, "[a]dequate care is based on an individualized assessment of an inmate's medical needs in light of relevant medical considerations." *Soneeya*, 851 F. Supp. 2d at 242. But, as Plaintiffs' experiences demonstrate, the DOC's policy preempts this constitutionally required assessment by uniformly denying access to maintenance MAT and forcing all patients to withdraw from buprenorphine treatment.

Plaintiffs never received a medical explanation for the reduction in their doses or the restriction on the duration of their prescriptions. Nor, contrary to the unsworn claims in the DOC's December 13 letter, did their DOC providers take their individual medical needs into account when making these determinations. Instead, the DOC's only consideration was the compulsory-withdrawal policy. For example, when halving Mr. Sclafani's 16mg per day dose against his will, Dr. Aysha Hameed, the sole doctor who works in MCI-Cedar Junction's medical department, told Mr. Sclafani, "you will get 8mg, because that is the way it is here." Sclafani Decl. ¶ 24. Dr. Hameed went on to explain that no one at MCI-Cedar Junction was allowed to stay on buprenorphine for more than 90 days. *Id.* ¶ 25. The Health Services Administrator

echoed this message when, in response to Mr. Sclafani's request to continue his individualized treatment, she wrote, "we are only providing subutex here for up to 90 days." Frederickson Decl., Ex. 10; Sclafani Decl., ¶ 36. As further indication that there was no medical reason to remove Mr. Sclafani from his buprenorphine, Dr. Hameed's records reflect that she told Mr. Sclafani that "prior to discharge[,] we can reinstitute [the] Suboxone program." Frederickson Decl., Ex. 7 at 7-4.

Mr. Feinstein received similar messages from Dr. Hameed, who explained her decision to reduce his 12 mg per day dose by sixty-six percent by stating her belief that no one needed more than 4mg of buprenorphine. Feinstein Decl. ¶ 28. She also told him that the buprenorphine treatment at MCI-Cedar Junction would continue "for only 90 days at most." *Id.* As documented in Dr. Hameed's records, Mr. Feinstein will be "prescribed Suboxone up to 90 days[,]" and "then restart Suboxone 60 to 90 days prior to release into the community" "so that he is back on Suboxone program to avoid overdose." Frederickson Decl., Ex. 8 at 8-9, 8-11. Finally, Mr. Cappola heard nearly identical refrains from nurse practitioners and intake providers alike, all of whom told him that the DOC offered buprenorphine in "only a 90-day program." Cappola Decl. ¶¶ 28–32, 41; Frederickson Decl., Ex. 11.

As the Deputy Superintendent of Cedar Junction explained, the buprenorphine "program is offered to inmates for their first 90 days of incarceration and is available as part of an inmate['s] release." Howlett Decl., Ex. 1. There can be no individualized assessment under these circumstances because, regardless of the needs of the individual patient, the outcome is the same: forced withdrawal from buprenorphine treatment. *See Kosilek*, 774 F.3d at 91 (noting that "any such [blanket] policy would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs").

Finally, this is not a case where "two alternative courses of medical treatment exist, and both alleviate negative effects within the boundaries of modern medicine." *Id.* at 90. Here, the DOC simply does not permit maintenance treatment during incarceration; it instead compels tapering off such treatment over 90 days at a capped dosage. The DOC's compulsory-withdrawal policy therefore denies Plaintiffs constitutionally adequate care for their serious medical needs.

<blockquote>2.    *Plaintiffs Are Likely to Satisfy the Subjective Prong.*</blockquote>

As applied to Plaintiffs, Defendants' compulsory-withdrawal policy constitutes deliberate indifference to a serious medical need. "In the First Circuit, allegations that prison officials denied or delayed recommended treatment by medical professionals may be sufficient to satisfy the deliberate indifference standard." *Pesce*, 355 F. Supp. 3d at 48 (internal quotations and citation omitted). Here, Defendants' policy disregards Plaintiffs' medical needs in favor of a one-size-fits-all ban on buprenorphine maintenance treatment. Plaintiffs are thus "likely to succeed on the merits of [their] Eighth Amendment claim" because the DOC "ignores treatment prescriptions given to Plaintiff[s] by [their medical providers]." *See id.* at 48. Indeed, Defendants have been notified of Plaintiffs' serious medical needs and their buprenorphine prescriptions, yet they have not agreed to provide Plaintiffs with their medically necessary maintenance treatment.

Although prison officials might not be deliberately indifferent if they "make judgments balancing security and health concerns that are within the realm of reason and made in good faith," *Kosilek*, 774 F.3d at 92 (internal quotations and citation omitted)), that is not the situation here. Defendants cannot conceivably identify any legitimate security reasons for *allowing* limited buprenorphine doses during the first and last 90 days of a prisoner's incarceration, while *disallowing* it for the time in between. Indeed, consistent with the practices of numerous Massachusetts jails that already provide access to maintenance MAT, the DOC is currently soliciting bids for contractors that will provide all three forms of MAT in all DOC facilities with

an anticipated start date in 2020. *See* Frederickson Decl., Exs. 6, 12. In the meantime, the DOC has no excuse for denying buprenorphine maintenance treatment that it is able to provide.

**B.     Plaintiffs Are Likely to Succeed on the Merits of Their ADA Claim for Denial of Buprenorphine Maintenance Treatment.**

Plaintiffs are also likely to succeed on their claim in Count II of the Complaint that denying them access to buprenorphine maintenance treatment constitutes unlawful discrimination under the ADA. The ADA prohibits public entities like the DOC from discriminating against qualified individuals with a disability on the basis of that disability. 42 U.S.C. §§ 12131(1)(B), 12132; *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998). The ADA "applies to all State and local detention and correctional facilities, regardless of whether the detention or correctional facility is directly operated by the public entity or operated by a private entity through a contractual, licensing, or other arrangement." 28 C.F.R. § Pt. 35, App. A; *see also* 28 C.F.R. § 35.130(b)(1). To succeed on the ADA claim of Count II, each Plaintiff must show: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *See Buchanan v. Maine*, 469 F.3d 158, 170–71 (1st Cir. 2006). Each element is satisfied here.

*1.     Plaintiffs Are Qualified Individuals with Disabilities.*

Individuals with OUD, including Plaintiffs, are "qualified individuals with disabilities" under the ADA. *See* 42 U.S.C. § 12210; *Pesce*, 355 F. Supp. 3d at 45. A "disability" includes "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Such impairments include "drug addiction." 28 C.F.R. § 35.108(b)(2). Plaintiffs' disabilities are severe and chronic, as they have each struggled with opioid addiction

for 10 or more years. Sclafani Decl. ¶¶ 8–13; M. Sclafani Decl. ¶ 6; Feinstein Decl. ¶¶ 9–16; P. Feinstein Decl. ¶ 5; Cappola Decl. ¶¶ 8–14; D. Cappola Decl. ¶ 5. Left untreated, their OUD "substantially limits" major life activities, such as caring for oneself, learning, concentrating, thinking, communicating, and working. Sclafani Decl. ¶¶ 15–18; M. Sclafani Decl. ¶ 4; Feinstein Decl. ¶¶ 17–20; P. Feinstein Decl. ¶¶ 9–11; Cappola Decl. ¶¶ 20–21; D. Cappola Decl. ¶ 13; Potee Decl. at ¶¶ 5, 9–10. Plaintiffs thus qualify for ADA protection.

2. *Plaintiffs Are Being Denied the Benefit of Health-Care Programs and Discriminated Against Because of Their Disability.*

Plaintiffs also satisfy the second and third elements for demonstrating an ADA violation. Medical care is a service within the meaning of the ADA. *See Yeskey*, 524 U.S. at 210. The U.S. Attorney has already instigated an ADA investigation into the DOC for refusing to provide MAT to individuals whose OUD "has been identified as requiring" MAT prior to incarceration. Here, in at least three ways, Plaintiffs are likely to show that the DOC's compulsory-withdrawal policy denies medical care to Plaintiffs by reason of their disability, and thus violates the ADA.

First, denying prisoners' access to MAT, when that denial is not based on individualized medical inquiry, is so unreasonable that it gives rise to an inference of unlawful disability discrimination. *See Pesce*, 355 F. Supp. 3d at 46; *Aroostook Cty.*, 376 F. Supp. 3d at 160. The denial of medical care violates the ADA when it is "so unreasonable—in the sense of being arbitrary and capricious—as to imply that it was pretext for some discriminatory motive." *Lesley v. Hee Man Chie*, 250 F.3d 47, 55 (1st Cir. 2001).[3] *Pesce* held that a county's blanket prohibition of methadone maintenance treatment gave rise to an inference of discrimination because it was not based on individualized medical or security considerations. 355 F. Supp. 3d at 47. The same

---

[3] Cases interpreting the Rehabilitation Act and the ADA are interchangeable. *See Theriault v. Flynn*, 162 F.3d 46, 48 n.3 (1st Cir. 1998).

is true here. Far from relying on "reasoned medical judgment," the DOC's compulsory-withdrawal policy "[does] not give[] any consideration to [Plaintiffs'] specific medical needs nor indicated any likelihood to do so." *See id.* at 46. And neither security nor medical concerns could justify Defendants' refusal to provide Plaintiffs buprenorphine maintenance treatment, given Defendants' provision of buprenorphine for the first 90 days of Plaintiffs' sentence and their documented willingness to reinstitute the prescription during the last 90 days.

Second, the DOC's policy to halt buprenorphine maintenance treatment, as applied to Plaintiffs, violates the "broad principle that the ADA forbids discrimination among classes of persons with disabilities." *Fletcher v. Tufts University*, 367 F. Supp. 2d 99, 111 (D. Mass. 2005) (citing *Olmstead v. L.C.*, 527 U.S. 581 (1999)); *see also, e.g.*, *McNally v. Prison Health Servs.*, 46 F. Supp. 2d 49, 58–59 (D. Me. 1999) (denying summary judgment to jail where HIV-positive prisoner alleged unlawful disability discrimination because jail was "denying him immediate access to prescribed medications, a service provided to detainees in need of prescriptions for other illnesses"). If Plaintiffs had asthma, hypertension, or another chronic health condition requiring long-term medication, Defendants would provide it. They do not, for example, withhold insulin from diabetic prisoners after 90 days of incarceration. *Cf.* Potee Decl. ¶ 26. But because Plaintiffs have OUD, they are being denied the buprenorphine maintenance treatment that their medical providers had prescribed. This disparity underscores the stigma motivating the DOC's compulsory-withdrawal policy. "Medical decisions that rest on stereotypes about the disabled rather than 'an individualized inquiry into the patient's condition' may be considered discriminatory." *Pesce*, 355 F. Supp. 3d at 46 (quoting *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006)).

Third, Defendants' policy discriminates against Plaintiffs because it fails to reasonably accommodate their disability. The ADA requires public entities to make reasonable accommodations to avoid discrimination against a qualified individual with a disability, unless the public entity can show that making the accommodation would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7)(1); *see also Nunes v. Mass. Dep't of Correction*, 766 F.3d 136, 145 (1st Cir. 2014).[4] Here, Plaintiffs have requested a reasonable accommodation for their OUD—continuing their buprenorphine maintenance treatment—that will not fundamentally change DOC health services. MCI-Cedar Junction already provides buprenorphine for the first and last 90 days of inmates' sentences. Thus, Plaintiffs are "likely to succeed on the merits of [their] ADA claim against Defendants." *Pesce*, 355 F. Supp. 3d at 47.

## C. Plaintiffs' Claims Are Not Barred by an Exhaustion Requirement.

No exhaustion requirement defeats Plaintiffs' likelihood of success because there is no grievance system "capable of use" by Plaintiffs to remedy the denial of their buprenorphine maintenance treatment under the DOC's compulsory-withdrawal policy.

Under the Prison Litigation Reform Act (PLRA), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are *available* are exhausted." 42 U.S.C. § 1997e(a) (2013) (emphasis added). By its own terms, then, the PLRA requires exhaustion only of "available" administrative remedies. *Id.* Thus, "an inmate is required to exhaust those, *but only those*, grievance procedures that are 'capable of use'

---

[4] "While the Title II regulations refer to 'reasonable modification' rather than 'reasonable accommodation,' courts treat those terms interchangeably." *Aroostook Cty.*, 376 F. Supp. 3d at 158 n.15.

to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)) (emphasis added).

The Supreme Court has acknowledged that an administrative remedy "is not capable of use to obtain relief" when the grievance process "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *See id.* That is true of the Wellpath grievance process, and thus no administrative remedy is available to Plaintiffs.

Individuals seeking relief from a medical or clinical decision at a DOC facility must grieve through the process established by the medical contractor, which in this case is Wellpath. 103 Code Mass. Regs. § 491.11.[5] But Wellpath officers are "unable or consistently unwilling to provide any relief to aggrieved inmates" who wish to continue their buprenorphine maintenance treatment. *See Ross*, 136 S. Ct. at 1859.

The Deputy Superintendent of MCI-Cedar Junction has confirmed in writing that buprenorphine "is offered to inmates for their first 90 days of incarceration." Howlett Decl., Ex. 1. Given this language, Wellpath may believe that it *cannot* provide relief to prisoners denied access to buprenorphine maintenance treatment because it is bound by DOC policy. Indeed, at least two Wellpath providers told Plaintiffs that this policy came from "higher ups" or "people above" them. Cappola Decl. ¶¶ 29, 31. Conversely, even if Wellpath does believe it has the power to provide such relief, it is clear that it *will not* exercise this power under any circumstances. As the Health Services Administrator confirmed in writing to Mr. Sclafani, Wellpath is "only providing subutex here for up to 90 days" (Frederickson Decl., Ex. 10; Sclafani Decl. ¶ 36), and several DOC nurses and nurse practitioners reiterated a similar message

---

[5] When Mr. Sclafani attempted to file a general administrative grievance regarding the lack of buprenorphine maintenance treatment at MCI-Cedar Junction, a DOC official returned the form and explained that Mr. Sclafani must instead submit a medical grievance. Sclafani Decl. ¶ 34.

to Mr. Cappola (Cappola Decl. ¶¶ 28–31). Reflecting this reality, when Plaintiffs requested to stay on their prescribed doses of buprenorphine, Dr. Hameed and other providers at MCI-Cedar Junction consistently responded that they could prescribe buprenorphine for at most 90 days. Sclafani Decl. ¶¶ 25–26, 35–36; Feinstein Decl. ¶¶ 24–29; Cappola Decl. ¶¶ 28–31. As a result, regardless of whether Wellpath officials uniformly cannot or will not alter the DOC's compulsory-withdrawal policy, MCI-Cedar Junction's medical grievance process need not be exhausted because it "operates as a simple dead end" for grievances about access to buprenorphine maintenance treatment. *See Ross*, 136 S. Ct. at 1859.

Mr. Sclafani's experience bears this out. Despite submitting informal complaints, grievances, and an appeal, he consistently received either no response or denials based on the compulsory-withdrawal policy. Sclafani Decl. ¶¶ 27, 34–37. Wellpath officers were simply "unable or consistently unwilling to provide [him] relief." *Ross*, 136 S. Ct. at 1859. The same conclusion is true with respect to MCI-Norfolk, where Mr. Sclafani transferred after his time at MCI-Cedar Junction. According to the DOC's own documents, buprenorphine is not available at this facility, and Wellpath officials are thus unable to remedy the denial of Mr. Sclafani's buprenorphine maintenance treatment. Frederickson Decl., Ex. 5. There is therefore no grievance procedure at either MCI-Cedar Junction or MCI-Norfolk "capable of use" to obtain "relief for the action complained of," and exhaustion is not required by any Plaintiff.

## II. PLAINTIFFS FACE IMMEDIATE IRREPARABLE INJURY.

Plaintiffs will suffer irreparable harm unless they receive buprenorphine maintenance treatment while incarcerated. "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction,

after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty.*
*Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).

Absent injunctive relief, Defendants' compulsory-withdrawal policy will force Plaintiffs
to choose between two types of irreparable harm. Involuntary cessation of buprenorphine will
cause them to suffer the excruciating physical and psychological symptoms of acute withdrawal.
*See* Potee Decl. ¶ 27; Walley Decl. ¶ 12. Forced withdrawal also exposes Plaintiffs to increased
risk of relapse, overdose, and death while incarcerated in DOC facilities and upon release. *See*
Potee Decl ¶ 29; Walley Decl. ¶¶ 7, 13; *Pesce*, 355 F. Supp. 3d at 48 (finding reasonable
likelihood of irreparable harm where there was a "high risk of overdose and death upon [] release
if not treated during [] incarceration."); *Aroostook Cty.*, 376 F. Supp. 3d at 162 (same). The only
way for Plaintiffs to avoid the suffering and risk associated with forced withdrawal is to purchase
their life-saving buprenorphine on the black market, exposing themselves to DOC discipline and
increased periods of incarceration. Absent relief, Plaintiffs will suffer the irreparable injury of
having to choose every day whether to undergo the pain and danger of withdrawal or risk self-
medicating in DOC facilities.

## III.    THE BALANCE OF THE HARDSHIPS FAVORS PLAINTIFFS.

The irreparable harm Plaintiffs face absent relief greatly outweighs any potential harm to
Defendants. There is an established protocol for the successful administration of buprenorphine
in correctional settings. Indeed, the DOC currently administers buprenorphine to criminally
sentenced men, has administered buprenorphine to all three Plaintiffs, and continues to
administer the medication to Mr. Feinstein and Mr. Cappola. In addition, the DOC will provide
all three forms of MAT in all DOC facilities with an anticipated start date in 2020. Frederickson
Decl., Ex. 6, 12. It is difficult to understand how continuing to provide buprenorphine to

Plaintiffs until the DOC starts its MAT program would injure Defendants. Granting injunctive relief would therefore impose minimal burden on Defendants. *See Aroostook Cty.*, 376 F. Supp. 3d at 162 (finding injunction requiring prison to provide MAT imposed a "limited burden" where prison could administer in ways "that would avoid any risk of diversion" and former prisoner had received MAT with "no apparent security impact"). If relief is not granted, Plaintiffs face either the pain and risks of forgoing their life-saving treatment, or the risks of purchasing buprenorphine on the black market. The balance of harms thus favors granting Plaintiffs' motion.

## IV.     THE PUBLIC INTEREST STRONGLY FAVORS INJUNCTIVE RELIEF.

The public interest also favors Plaintiffs' requested injunctive relief. Defendants' compulsory-withdrawal policy, as applied to people who were receiving buprenorphine maintenance treatment when they entered DOC custody, provides one more barrier to effective treatment for those suffering from OUD. It intensifies rather than ameliorates the ongoing opioid crisis by disrupting effective treatment and making relapse and potential overdose more likely. "[T]he public interest is better served by ensuring [Plaintiffs] receive[] the medically necessary treatment that will ensure [they] remain[] in active recovery." *Pesce*, 355 F. Supp. 3d at 49; *see also Aroostook Cty.*, 376 F. Supp. 3d at 162 (same).

## CONCLUSION

For the foregoing reasons, this Court should issue a Temporary Restraining Order and Preliminary Injunction requiring Defendants to provide ongoing buprenorphine maintenance treatment to Plaintiffs throughout their incarceration in a DOC facility, and preventing Defendants from imposing discipline against Plaintiffs for any buprenorphine obtained while in DOC custody during any period of time when Defendants were not providing Plaintiffs with buprenorphine maintenance treatment.

Respectfully submitted,

JOSEPH SCLAFANI, MICHAEL FEINSTEIN, and BRET CAPPOLA

By their attorneys,


*/s/ Robert Frederickson III*
Robert Frederickson III (BBO 670111)
Marielle Sanchez (BBO 703897)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.:  617.570.1000
Fax:  617.523.1231
RFrederickson@goodwinlaw.com
MSanchez@goodwinlaw.com


Ira J. Levy (*Pro hac vice* pending)
Alexandra D. Valenti (*Pro hac vice* pending)
Aviv A. Zalcenstein (*Pro hac vice* pending)
Christine Armellino (*Pro hac vice* pending)
GOODWIN PROCTER LLP
The New York Times Building
620 Eight Avenue
New York, NY 10018
Tel.:  212.813.8800
Fax:  212.355.3333
ILevy@goodwinlaw.com
AValenti@goodwinlaw.com
AZalcenstein@goodwinlaw.com
CArmellino@goodwinlaw.com


Matthew R. Segal (BBO 654489)
Jessie J. Rossman (BBO 670685)
Laura K. McCready (BBO 703692) (*Pro hac vice* pending)
American Civil Liberties Union
Foundation of Massachusetts, Inc.
211 Congress Street
Boston, MA 02110
Tel.:  617.482.3170
msegal@aclum.org
jrossman@aclum.org
lmccready@aclum.org

*Attorneys for Plaintiffs Joseph Sclafani, Michael Feinstein, and Bret Cappola*

Dated:   December 19, 2019