# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH SCLAFANI, MICHAEL FEINSTEIN, and BRET CAPPOLA, <br><br> Plaintiffs, <br><br> CAROL A. MICI, in her official capacity as Commissioner of the Massachusetts Department of Corrections, <br> DOUGLAS DEMOURA, in his official capacity as Superintendent of MCI-Cedar Junction, and STEVE SILVA, in his official capacity as Superintendent of MCI-Norfolk, <br><br> Defendants. | C.A. No. |

# DECLARATION OF BRET A. CAPPOLA

Pursuant to 28 U.S.C. § 1746, I, Bret A. Cappola, declare as follows:

1. I am 38 years old and I am currently incarcerated at MCI-Cedar Junction. Before being incarcerated, I lived in Brockton, Massachusetts.

2. I have been diagnosed with opioid use disorder. My doctors prescribed medication for addiction treatment (MAT) with buprenorphine to treat my opioid use disorder. With the help of my medication, I have entered into active recovery for the first time since I started using opioids as a teenager.

3. When I pled guilty to my charges, I thought the Department of Corrections (DOC) was allowing people to stay on their buprenorphine. But when I got to Cedar Junction, I learned that people are not allowed to stay on their buprenorphine for more than 90 days. I am terrified that DOC will force me off my medication because DOC officials have told me that I will be taken off of my prescription on December 30th.

4. I cannot imagine being in active recovery without buprenorphine. I know that if I am not allowed to continue taking my medication during my period of incarceration, I will lose control of my addiction and relapse. I am terrified that I will overdose and die.

*Life Before Active Addiction*

5. I had a good childhood. I had an older brother I looked up to and a younger brother who looked up to me. I always had a lot of friends, and enjoyed fixing things with my hands.

6. I was very close to my grandmother, who lived up the street from my family. I would often ride my bike to her house to see her.

7. I thought I was going to go places. I never thought that I would end up here.

*History of Addiction*

8. I started using marijuana and drinking alcohol when I was around thirteen years old. I then progressed to drugs like acid, ecstasy, and cocaine.

9. I started using OxyContin when I was eighteen or nineteen years old. It spread through Brockton very quickly, and seemed to infect the entire city. When that got too expensive, I switched to heroin. Throughout most of my twenties and thirties, I was in a state of active heroin addiction.

10. I tried many different treatment programs based on straight detox, but none of them worked for me. Each time I ended up relapsing and reentering active addiction because the detox did nothing to curb my cravings.

11. I tried methadone, but that also did not work for me because it did not stop my cravings. While I was on methadone, I especially struggled with addiction to benzodiazepines. While I was receiving methadone treatment, I blacked out on benzodiazepines and robbed a pharmacy for Klonopins, which goes to show that methadone did not work for me.

12. From 2010 to 2017, I was incarcerated in DOC facilities, mainly in Souza-Baranowski Correctional Center for the pharmacy robbery conviction.

13. During this sentence, I had to detox from methadone. The withdrawal was terrible. I hallucinated. I hardly slept for three months. Because of that experience, I am scared to go back on methadone.

14. I was not receiving treatment when I was at Souza, and I was still in active addiction. I got high every day I was in Souza. I was around more drugs than I was on the streets, and I used whatever drugs I could get my hands on. On several occasions, the people who provided me with drugs attacked me and stabbed me. Three times while I was incarcerated at Souza, I

2

went to the hospital covered in blood. Because the DOC failed to treat my opioid use disorder, my addiction got worse during the time I spent in DOC facilities.

*Road to Active Recovery*

15. A few weeks after I got out of Souza, I wanted to make a change, so I decided to enroll in a medication for addiction treatment (MAT) program. After asking me about my addiction and treatment history, the medical providers prescribed buprenorphine for my treatment.

16. During the stabilization phase of my buprenorphine treatment, my doctors gave me several different doses in order to find the correct dosing for my medication. During that time, I had several slip-ups. Still, I was able to stay in the buprenorphine program.

17. In this stabilization phase, I had one of my slip-ups during an encounter with my ex-girlfriend, who also struggles with addiction. In the midst of this slip-up, I stole a car and ended up getting into a chase with police officers. I was caught in Greenfield, Massachusetts and ultimately sent to the Franklin County House of Correction.

18. When I arrived in Franklin County House of Correction, I was relieved to learn that they prescribe MAT treatment for opioid use disorder.

19. The medical providers at Franklin County confirmed my diagnosis of opioid use disorder, and after asking me questions about my addiction and treatment history, prescribed 16 mg per day of buprenorphine. For twelve months in Franklin County, I remained on buprenorphine maintenance treatment at the same 16 mg dose to treat my opioid use disorder.

20. Thanks to Franklin County's MAT program, I was able to achieve active recovery for the first time since I started using opiates as a teenager.

21. Buprenorphine is the only addiction treatment that has ever worked for me. When I am not on the medication, my body is always obsessing about getting drugs to make itself feel better. It feels like something is missing. Now that I am receiving buprenorphine treatment, I feel normal. I am comfortable in my body, and I feel like I can do something with my life.

22. In June 2019, I was transferred to the Hampden County House of Correction. The medical providers informed me that Hampden County will provide only 8 mg of buprenorphine per day, which I received throughout my three months at that facility. Nobody at Hampden County gave me a medical reason for dropping my dose from 16 to 8 mg.

23. While I was being held for the car incident in Franklin and Hamden Counties, I also had pending charges for an earlier incident (breaking and entering into a vacant house) that had occurred when I was attempting to enter into active recovery, but had not yet done so.

24. As a result, as I analyzed my options for a final disposition on the car charges and the breaking and entering, my primary concern was that I needed be able to stay in recovery with buprenorphine maintenance treatment.

25. Based on my understanding of the news, I thought that, as of September 1, 2019, the DOC would allow inmates to stay on their MAT. I waited until after September 1 to plead guilty specifically so that I could be sure I would continue to receive the buprenorphine maintenance treatment for my opioid use disorder that my doctors had prescribed for me.

26. At my sentencing hearing, I told the judge that I needed to stay on my medication for addiction treatment. I was sentenced to four years' imprisonment in a DOC facility. The judge wrote on my mittimus that I was a "CARE Act Recipient," referring to the 2018 state legislation that increased access to medication for addiction treatment in Massachusetts prisons and jails.

*Lack of Buprenorphine Maintenance Treatment in the Massachusetts Department of Correction*

27. I entered Cedar Junction on September 26, 2019.

28. The day I was admitted, an intake nurse told me I could only receive buprenorphine for 90 days. I was shocked, and I explained that I had been told that I could stay on my medication. She said, "Oh no, it is a 90 day program. There is 90 days in and 90 days out."

29. When I met with the nurse practitioner who is my designated provider at Cedar Junction, she similarly told me that it was currently a 90-day buprenorphine program, but that it might change. She also told me that she did not want to take me off buprenorphine, but that people above her were in control and there was a 90-day limit. She prescribed me with 8 mg per day of buprenorphine, and told me that was the maximum dosage for any patient at Cedar Junction.

30. I was never given a medical reason for my dose or the 90-day limit.

31. Another time, a different nurse practitioner asked me, "You know this is only a 90 day program, right?" That nurse practitioner also told me that it was "higher-ups" who set that policy.

32. I do not know of anyone at Cedar Junction who has received buprenorphine for opioid use disorder at more than 8 mg per day or for more than 90 days.

33. Every morning, those of us who are prescribed buprenorphine at Cedar Junction line up in the medical unit to receive our medication. The nurse hands out the crushed-up tablets, and we put the medication under our tongues. We then sit in an auditorium while an officer observes us for ten or fifteen minutes, and then we drink water. The officer then checks our mouths to make sure the medication has all dissolved.

34. Cedar Junction houses the patients who receive buprenorphine on Block 5. Those of us who are housed on Block 5 have less access programs and other services that are available to other prisoners who are not prescribed buprenorphine. For example, we cannot have contact visits with our family members. We also have less access to drug and alcohol counseling, and most prison jobs are unavailable to us. The lack of programming and work opportunities makes a big difference because prisoners can earn good-time sentence reductions of up to fifteen days per month by participating in programs and work.

35. I have not been able to get a job throughout my time on Block 5.

36. I have not been able to access drug and alcohol counseling throughout my time on Block 5.

37. I have not been able to have a contact visit with my family members throughout my time on Block 5.

38. DOC officials have told me that they will discontinue my prescription on December 30. I am afraid for my life and my safety if the DOC withholds medication that I know I need to stay alive. If they take me off, I will deteriorate.

39. Since I rely on the providers at Cedar Junction to stay on my life-saving medication, I am scared to get on their bad side. I do not feel like I can submit a grievance because I cannot afford to anger the facility or the providers. I know based on my previous experiences in DOC facilities that they do not like grievances, so I am worried they will retaliate against me if I submit one. I fear that, if I submit a grievance, they might take me off my medically necessary buprenorphine or otherwise punish me.

40. Even though I felt I could not submit a grievance, I did want to ask Wellpath to let me stay on my medication, so I wrote a letter about it. I thought a letter would be less threatening than a grievance. It was a plea for help.

41. I received a response to my letter from Dawn Struzziera, the Health Services Administrator at Cedar Junction. In response to my request to be kept on buprenorphine, she wrote, "Here at Cedar Junction we are required to keep patients on the maintenance dose for the first 90 days they are here and then we can restart them when they are in their last 90 days to prepare them for re-entry."

42. I recently saw the DOC classification team to determine where I will be transferred after my time at Cedar Junction. When I explained that I need to be transferred to a facility that offers buprenorphine maintenance treatment, one member of the DOC classification team told me that buprenorphine is only to detox people from heroin, and said that I needed to stop trying to stay on it. She said that it is a 90-day buprenorphine program at Cedar Junction. I was classified to Norfolk House of Correction, which I understand does not offer buprenorphine for addiction treatment.

43. I am horrified to think about the withdrawal that I will have to go through if they take me off my medication. Because I have gone through buprenorphine withdrawal before, I know that – if they force me off my medication – I will experience symptoms like sleeplessness, vomiting, diarrhea, tremors, pain, sweating, and cravings for opioids, which I experienced that last time I forced into withdrawal during a prior incarceration.

44. I believe that the only way to avoid this excruciating withdrawal would be to purchase my medically necessary buprenorphine on the black market in prison. I am scared that, if I were forced to self-medicate in this way, I would be punished and retaliated against by the DOC, and exposed to violence by other prisoners.

45. I also learned at Souza that illicit drugs like heroin and fentanyl are available in DOC facilities. I have heard from fellow prisoners who have spent time at Norfolk that it is flooded

with drugs. If the DOC forces me off my medication, my cravings will return. I am terrified that, if my opioid use disorder is not being treated with buprenorphine, and someone offers me drugs in prison, I will not be able to say no. I am scared that I will relapse, overdose, or even die while I am in prison in a DOC facility.

46. I have seen firsthand how MAT gives people their lives back. Both my parents struggled with opioid use disorder in the 1980s. They both started receiving methadone treatment in 1986. Both continue to receive methadone treatment to this day, and both have been in active recovery for all that time. Because of their methadone treatment, they were able to provide a loving, stable home for me and my brothers.

47. I do not understand why the Department of Corrections would try to stop me from reaching the kind of long-term recovery my parents have achieved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 18, 2019

_____
Bret A. Cappola